[No. B233672. Second Dist., Div. Four. Oct. 16, 2012.]

SUSAN GORLACH, Plaintiff and Respondent, v.
THE SPORTS CLUB COMPANY et al., Defendants and Appellants.

COUNSEL

Epstein Becker & Green, William O. Stein and Eric A. Cook for Defendants and Appellants.

Shegerian & Associates and Carney R. Shegerian for Plaintiff and Respondent.

OPINION

**SUZUKAWA, J.**—Defendants The Sports Club Company and five of its officers appeal an order denying a motion to compel arbitration.[1] We conclude that the trial court properly denied the motion to compel, and thus we affirm.

## STATEMENT OF FACTS

Susan Gorlach is the former human resources director for Sports Club. She resigned her position on August 6, 2010.

---

[1] Throughout this opinion, we use "Sports Club" interchangeably to refer both to the company and to the six defendants.

Prior to 2010, there were no arbitration agreements between Sports Club and its employees (or "team members"). In 2010, Sports Club revised its "Team Member Handbook" (handbook) to include an arbitration agreement. The revisions relevant to this appeal are as follows:

(1) On page 31, the handbook states: "As a condition to employment, all Team Members must sign the Mutual Agreement to Arbitrate Claims found in Appendix 4."

(2) Appendix 4, "Mutual Agreement to Arbitrate Claims," states in relevant part: "The Sports Club Company, Inc. ('Company') and I agree to the resolution by arbitration of all claims, disputes, and/or controversies (collectively 'claims'), whether or not arising out of my employment (or its termination), that the Company may have against me or that I may have against the Company or against its partners, owners, employees or agents, in their capacity as such or otherwise." It concludes: "I acknowledge that I have carefully read this Agreement, that I understand its terms, that all understandings and agreements between the Company and me relating to the subjects covered in the Agreement are contained in it, and that I have entered into the Agreement voluntarily and not in reliance on any promises or representations by the Company other than those contained in this Agreement itself. I understand that by entering into this Agreement, the Company and I have both waived our right to a jury trial and our right to appeal with respect to all claims covered by this Agreement."

Gorlach was tasked with presenting the new handbook to all Sports Club employees and collecting their signatures to the arbitration agreement. She began conducting general meetings about the handbook and collecting employee signatures the week of June 14, 2010.

On June 30, 2010, Gorlach told chief operating officer April Morgan that all corporate employees except four had signed the arbitration agreement, but she did not identify herself as one of the employees who had not signed. She also told Morgan that 254 of the 256 employees who had attended the general meetings signed all signature pages of the handbook, but that 164 employees had not yet attended meetings. Gorlach said she would resume "make up" meetings the week of July 11, 2010. On July 21, 2010, she informed the Sports Club's group exercise team that she would like their signatures by July 23, 2010.

Throughout June and July 2010, Gorlach led Sports Club executives to believe that she had signed the arbitration agreement, although she had not. On July 30, 2010, Gorlach sent an e-mail to four Sports Club executives, which addressed the need to "continue to think about how we're going to proceed when an active team member does not sign the Arbitration Agreement." The e-mail continued: "From our 'Legal Update' meeting, I realize this has been an important question and potential direction for SCC [(Sports Club Company)]; therefore, I wanted to give you an update. Those who have not signed are inquiring about what it means to his or her status as a team member of SCC. As per our meetings, I'm giving them time to seek counsel prior to signing to prevent any forced agreement and since it's not an implied agreement. Additionally, it appears that Natania Goldberg has not signed just yet amongst others. . . . Leanne will be conducting the presentations in New York the week of August 9th while I help fill in for Karol since he'll be on vacation."

Gorlach resigned her position with Sports Club on August 6, 2010. It is undisputed that she never signed the arbitration agreement.

## STATEMENT OF THE CASE

Gorlach filed a complaint against Sports Club and five of its officers on January 7, 2011.[2] The complaint alleged causes of action for wrongful termination, retaliation, paramour sexual harassment, intentional infliction of emotional distress, defamation, breach of contract, and negligence.

Sports Club answered the complaint on February 23, 2011, generally denying the complaint's allegations and asserting 26 affirmative defenses. In its 22d affirmative defense, Sports Club asserted that the court lacked jurisdiction to resolve the dispute "due to the existence of a mandatory, binding arbitration agreement that Plaintiff agreed to be bound by."

I. *Motion to Compel Arbitration*

On April 15, 2011, Sports Club moved to compel arbitration. The motion asserted that although Gorlach did not sign the arbitration agreement, she assented to it by her continued employment with Sports Club. In support of the motion to compel arbitration, Sports Club submitted the following declarations:

---

[2] The Sports Club officers named as defendants are chief executive officer Rex Licklider, president Nanette Francini, chief operating officer April Morgan, vice-president of sales Phillip Kasdorf, and founder and manager Michael Talla.

*Declaration of Jeff Peters.* Peters is the general manager of the Sport Club's West Los Angeles fitness club. On May 11, 2010, he attended a quarterly manager's meeting, at which Gorlach presented updates to the handbook. Gorlach emphasized that among the updates was a new arbitration agreement. Gorlach said Sports Club expected each team member to sign the arbitration agreement as a condition of employment. She provided each team member with a copy of the arbitration agreement so that each could sign it and hand it in at the end of the presentation.

*Declaration of Nanette Francini.* Francini is Sports Club's president and cofounder. On June 14, 2010, she attended Gorlach's presentation of the handbook at the company's corporate offices. Gorlach emphasized that the handbook contained an arbitration agreement and that signing the agreement was a condition of employment. On about June 15, 2010, Francini asked Gorlach whether all Sports Club employees had signed the arbitration agreement. Gorlach responded "that everyone but four individuals had signed the Agreement." Because Gorlach did not identify herself as one of these four individuals, Francini believed she had signed the agreement. On about July 7, 2010, Francini asked Gorlach whether everyone on the executive committee, which included Gorlach, had signed the agreement. She said that they had. Gorlach never told Francini that she did not want to sign the agreement or that the agreement did not apply to her.

*Declaration of Rex Licklider.* Licklider is Sports Club's chief executive officer. He was not able to attend Gorlach's presentation of the handbook at the corporate offices on June 14, 2010. Subsequently, Gorlach told him that all corporate office employees had signed the handbook and arbitration agreement except Tim O'Brian and himself; Licklider immediately signed it. Shortly thereafter, Licklider asked Gorlach if all corporate team members had signed the handbook and arbitration agreement; she replied that "everyone at corporate" had signed the handbook and arbitration agreement. Licklider understood this to mean that plaintiff had signed the arbitration agreement because she was a member of "corporate." Gorlach never told Licklider that she did not want to sign the arbitration agreement.

*Declaration of April Morgan.* Morgan is Sports Club's chief operating officer. Gorlach was responsible for updating the handbook, which last had been updated in 2002 and did not contain an arbitration agreement. Gorlach began updating the handbook in the summer of 2008. The major update to the

handbook was the addition of an arbitration agreement, which is appendix 4 to the handbook. The arbitration agreement was also referenced within the handbook. Signing the agreement is a condition of employment with Sports Club.

Gorlach was tasked with presenting and distributing the new handbook and ensuring that each employee signed each applicable signature page. Gorlach was also to maintain all of the employees' signature pages, including the arbitration agreement's signature pages. Gorlach began presenting the handbook to Sports Club employees on June 14, 2010. She made 26 presentations of the handbook to employees over the next four days. If employees did not sign the arbitration agreement at the presentations, Gorlach would follow up with them and attempt to obtain their signatures.

On June 30, 2010, Gorlach stated that all corporate employees except for four had signed the arbitration agreement. She did not identify herself as an employee who had not signed the arbitration agreement. Further, she said that 254 of the 256 employees who had attended the presentations signed all signature pages of the handbook, but that 164 employees had not yet attended presentations. She said she would resume "make up" presentations the week of July 11, 2010.

On July 30, 2010, Gorlach sent an e-mail saying that some Sports Club employees did not want to sign the arbitration agreement and were seeking advice on how to proceed.

## II.  Opposition to Motion to Compel Arbitration

Gorlach opposed the motion to compel arbitration. She noted that she did not sign the arbitration agreement, and thus she urged there was no enforceable arbitration agreement between her and Sports Club. She further contended that the arbitration agreement was procedurally and substantively unconscionable, and Sports Club had waived its right to compel arbitration by taking steps inconsistent with an intent to invoke arbitration.

In support of her opposition, Gorlach declared that Sports Club did not ask its employees to sign an arbitration agreement until 2010, at which time she declined to sign the agreement.

## III.  Reply to Motion to Compel Arbitration

Sports Club contended that even though Gorlach did not sign the arbitration agreement, she is bound by it as a matter of law because she continued to work for Sports Club after learning that signing the agreement was a

condition of employment. The arbitration agreement thus was an implied-in-fact contract between Gorlach and Sports Club. Further, Gorlach is estopped from claiming the arbitration agreement does not apply to her because she deliberately misled Sports Club into believing that she signed it, and Sports Club relied on her misrepresentations to its detriment. Sports Club also contended that it did not through its conduct waive the arbitration agreement, and the agreement is neither substantively nor procedurally unconscionable.

## IV.   *Order Denying Motion to Compel*

The court denied the motion to compel on June 1, 2011, finding that "defendants have failed to demonstrate that there exists a written arbitration agreement between the plaintiff and defendants." The court agreed that Gorlach had led Sports Club to believe she had signed the arbitration agreement, but noted that when Gorlach resigned, she was still in the process of collecting signatures: "We're talking about a period of time in which—if this had gone on—we would have been into a bunch of different case law here if this had gone on for months under their noses and they hadn't known it or something, it would have been a whole different deal. It's clear from the declarations that all the signatures weren't in yet." The court noted, moreover, that just seven days before Gorlach resigned, she advised the chief operating officer that some employees still had not signed the arbitration agreement and were "inquiring about what it means to his or her status." Thus, the court said, "It sounds like by reading this that it was still in its rollout condition. . . . It sounds like it was still in the rollout condition and everyone hadn't signed it yet, including her. She made a choice not to sign it."

The court concluded: "[B]y her responses, did she make omissions which intentionally misled the [chief operating officer] and [chief executive officer] to believe that she was on board and she said she had signed? I think that she did. But at the same time, . . . [s]he quit before she signed it. There is no signed agreement. She clearly didn't want to go to arbitration. There's just no question based on everything that I read that she said she was never planning on signing this."

Sports Club timely appealed.

## DISCUSSION

■   Code of Civil Procedure section 1281.2 provides in relevant part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to

arbitrate the controversy exists . . . ." " '[T]he right to arbitration depends upon contract; a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract. [Citations.]' (*Engineers & Architects Assn.* v. *Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].) There is no public policy in favor of forcing arbitration of issues the parties have not agreed to arbitrate. (*Ibid.*) It follows that when presented with a petition to compel arbitration, the trial court's first task is to determine whether the parties have in fact agreed to arbitrate the dispute. [¶] We apply general California contract law to determine whether the parties formed a valid agreement to arbitrate." (*Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 88–89 [80 Cal.Rptr.2d 147].)

Ordinarily, we review a denial of a petition to compel arbitration for abuse of discretion. (*California Parking Services, Inc. v. Soboba Band of Luiseño Indians* (2011) 197 Cal.App.4th 814, 817 [128 Cal.Rptr.3d 560], citing *Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 484 [17 Cal.Rptr.3d 88].) However, where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo. (*California Parking Services, supra,* at p. 817, citing *Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425 [34 Cal.Rptr.3d 547].)

The parties agree that Gorlach never signed a written contract to arbitrate. Sports Club contends, however, that (1) Gorlach is equitably estopped from contending that the arbitration agreement does not apply to her and (2) an implied-in-fact arbitration agreement exists between Gorlach and Sports Club. We consider these issues below.

I. *Gorlach Is Not Equitably Estopped from Denying the Existence of the Arbitration Agreement*

Sports Club contends that Gorlach is equitably estopped from contending that the arbitration agreement does not apply to her because she deliberately misled the executive committee into believing she signed the agreement. It notes that Gorlach told executive committee members Morgan, Licklider, and Francini that "all of corporate" had signed the agreement, even though she had not. Further, Sports Club urges that Gorlach's responsibility for obtaining signatures and maintaining signed arbitration agreements gave it no practical way to determine that Gorlach had not signed, and Sports Club relied on her representations to its detriment. For the following reasons, we do not agree.

■ " 'The essence of an estoppel is that one has, by false statements or conduct, led another to do that which he would not otherwise have done and

as a result the other has suffered injury. [Citation.] The elements of an estoppel claim are: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and *(4) he must rely upon the conduct to his injury.*" [Citation.]' " (*Brown v. Chiang* (2011) 198 Cal.App.4th 1203, 1227 [132 Cal.Rptr.3d 48], italics added.) " 'The sine qua non of estoppel is that the party claiming it *relied to its detriment* on the conduct of the party to be estopped.' (*Orange County Water Dist. v. Association of Cal. Water etc. Authority* (1997) 54 Cal.App.4th 772, 780 [63 Cal.Rptr.2d 182].)" (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1342, fn. 8 [134 Cal.Rptr.3d 244], italics added.)

■ Estoppel generally is a question of fact. However, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law. (*Estate of Bonanno* (2008) 165 Cal.App.4th 7, 22–23 [80 Cal.Rptr.3d 560].)

In the present case, the trial court concluded there was no evidence that Sports Club relied to its detriment on Gorlach's implied representations that she had signed the arbitration agreement, and we agree. All of the evidence before the trial court suggested that when Gorlach resigned, Sports Club was still "rolling out" its new handbook and arbitration agreement—that is, it had not yet completed the process of having its employees sign the arbitration agreement. Moreover, although Sports Club had advised its employees, including Gorlach, that signing the arbitration agreement was a "condition of employment," there is no evidence that, as of the date of Gorlach's resignation, Sports Club had decided what it would do if an employee refused to sign the arbitration agreement or had terminated any employee for failing to sign the agreement. Accordingly, there was no evidence from which the trial court could have concluded that had Sports Club known Gorlach had not signed the arbitration agreement, it would have terminated her prior to August 6, 2010.

■ Sports Club contends it has been harmed by Gorlach's implied misrepresentations because it now finds itself "defending a lawsuit in the very venue [it] sought to avoid by virtue of the Arbitration Agreement." Although it is clear that Sports Club would have preferred to litigate this matter in an arbitral setting, it was entitled to do so only if both it *and Gorlach* agreed to submit to arbitration. There is no evidence that Gorlach would have agreed to do so, even if refusing to sign risked the loss of her job. Indeed, it appears that Gorlach left her job specifically *in order to* avoid signing the arbitration agreement. The issue, therefore, is not whether Sports Club would be better off if Gorlach had signed the arbitration agreement—from its perspective, it

undoubtedly would be. The issue, properly framed, is whether Sports Club would have terminated Gorlach for failing to sign the agreement prior to August 6, 2010—and as to that issue, as we have said, there is no evidence that it would have.[3] The trial court therefore properly found that there was no detrimental reliance by Sports Club and, hence, no equitable estoppel.

## II. *There Is No Implied-in-fact Arbitration Agreement*

Sports Club contends that even though there is no signed arbitration agreement between the parties, there is an implied-in-fact agreement to arbitrate that was created when Gorlach remained in Sports Club's employ after learning that signing the arbitration agreement was a condition of employment. It urges that California courts "have repeatedly upheld unexecuted arbitration agreements by finding that an implied-in-fact contract existed between the employer[] and employee[]. Implied-in-fact contracts are found in cases with unexecuted arbitration agreements when (1) employees have knowledge of the arbitration agreement and (2) employees continue to work after receipt of the arbitration agreement. In such cases, Courts have held that the employees' continued employment constitutes their acceptance of the agreements to arbitrate." For the following reasons, we do not agree.

■  Civil Code section 1621 defines an implied contract: "An implied contract is one, the existence and terms of which are manifested by conduct." " 'An implied contract " '. . . in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being the mere mode of proof by which they are to be respectively established.' " [Citation.] . . . Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an *intent* to promise." [Citation.]' (*Friedman v. Friedman* (1993) 20 Cal.App.4th 876, 887 [24 Cal.Rptr.2d 892], italics added; see also *Truck Ins. Exch. v. Amoco Corp.* (1995) 35 Cal.App.4th 814, 824–825 [41 Cal.Rptr.2d 551].)" (*Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1010 [55

---

[3] The three cases on which Sports Club relies are distinguishable from the present case because in each of those cases, there was evidence of detrimental reliance. (See *Gleed v. Lincoln Nat. Life Ins. Co.* (1944) 65 Cal.App.2d 213 [150 P.2d 484] [insurer's acceptance of late premiums for six years estopped the insurer from claiming that the insured had defaulted by making a final late payment]; *Benner v. Industrial Acc. Com.* (1945) 26 Cal.2d 346, 350 [159 P.2d 24] ["the employer and its insurance carrier cannot escape the consequences of their acts or conduct affirmatively engaged in to procure delay for purposes of settlement, or investigation or otherwise, upon which the employee has relied and by which he has been induced to delay the filing of a claim until after the expiration of the statutory period"]; *Lorenson v. City of Los Angeles* (1953) 41 Cal.2d 334, 340 [260 P.2d 49] ["Under all of those circumstances the city is properly held estopped to repudiate its own acts and declarations to its own monetary advantage and at the expense of the employee who was concededly illegally deprived of his salary."].)

Cal.Rptr.3d 911].) "Accordingly, a contract implied in fact 'consists of obligations arising from *a mutual agreement and intent to promise* where the agreement and promise have not been expressed in words.' [Citation.]" (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178 [134 Cal.Rptr.3d 779, 266 P.3d 287], italics added.)

California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment. Whether employment policies create unilateral contracts is "a factual question in each case." (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 11, 96 Cal.Rptr.2d 179 [999 P.2d 71] (*Asmus*).) " 'It is generally held that the existence of an implied contract is usually a question of fact for the trial court. Where evidence is conflicting, or where reasonable conflicting inferences may be drawn from evidence which is not in conflict, a question of fact is presented for decision of the trial court. . . . [¶] Further, on appeal we must draw all reasonable inferences in favor of the judgment.' [Citation.]" (*Caron v. Andrew* (1955) 133 Cal.App.2d 412, 416 [284 P.2d 550].)

In the present case, the trial court found that the evidence did not permit the inference that plaintiff had intended to agree to arbitrate disputes with Sports Club. According to the trial court, Gorlach "made a choice not to sign it. . . . [S]he didn't sign it, and she quit." "There's just no question based on everything that I read that she said she was never planning on signing this." The evidence before the trial court—including that plaintiff did not sign the agreement, inquired as to the consequences of refusing to sign, and resigned her position with the company—support the trial court's conclusion that there was no mutual intent to enter an arbitration agreement.

Sports Club cites *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416 [100 Cal.Rptr.2d 818] (*Brown & Root*) for the proposition that the trial court was required to find an implied contract because the evidence was undisputed that Gorlach continued in Sports Club's employ after learning about the arbitration agreement. In *Brown & Root*, plaintiff Craig began working for defendant Brown & Root's predecessor in 1981. In 1993, Brown & Root established a dispute resolution program that required all employee-employer disputes to be submitted to binding arbitration. In a memorandum sent to its employees, Brown & Root informed its employees: " 'The enclosed brochure explains the procedures as well as how the Dispute Resolution Program works as a whole. . . . IT APPLIES TO YOU. It will govern all future legal disputes between you and the Company that are related in any way to your employment.' " (*Id.* at p. 419.) Brown & Root sent copies of the memorandum and brochure to Craig's home in May 1993 and fall 1994. (*Id.* at pp. 419–420.)

Brown & Root terminated Craig's employment in April 1997. Craig sued. Brown & Root petitioned to compel arbitration; the trial court granted the petition, and the Court of Appeal affirmed. It reasoned that because general principles of contract law determine whether the parties have entered a binding agreement to arbitrate, "a party's acceptance of an agreement to arbitrate may be express [citations] or implied-in-fact where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer [citations]." (*Brown & Root, supra*, 84 Cal.App.4th at p. 420.) In the case before it, evidence credited by the trial court showed that Brown & Root twice sent copies of its memorandum and brochure to Craig, in 1993 and again in 1994. (*Id.* at p. 421.) The court concluded: "Accordingly, there is substantial evidence (1) that the memorandum and brochure were received by Craig in 1993 and again in 1994; (2) that she continued to work for Brown & Root until 1997; and (3) that she thereby agreed to be bound by the terms of the Dispute Resolution Program, including its provision for binding arbitration." (*Id.* at p. 422.)

We do not agree that *Brown & Root* governs the present case. In *Brown & Root*, the employee memorandum did not ask employees to sign an arbitration agreement; it simply informed them that any employment-related dispute would henceforth be subject to arbitration. The employee handbook in the present case is different: Rather than unilaterally imposing an arbitration requirement, the handbook told employees that, "As a condition to employment, all Team Members must *sign* the Mutual Agreement to Arbitrate Claims . . . ." (Italics added.) In other words, the handbook told employees that they must sign the arbitration agreement, implying that it was not effective until (and unless) they did so. Because Gorlach never signed the arbitration agreement, we cannot imply the existence of such an agreement between the parties.

The present case is analogous to *Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164 [69 Cal.Rptr.3d 223] (*Mitri*). There, the plaintiffs sued their former employer for sexual discrimination and harassment. The defendants moved to compel arbitration. In support of their motion to compel, the defendants submitted copies of their employee handbook, which stated: " 'Any dispute arising out of employment with the Company, as allowed by law, will be settled by binding arbitration. *As a condition of employment, all employees are required to sign an arbitration agreement.*' " (*Id.* at p. 1167, italics added.) The defendants submitted evidence that both employees had signed an acknowledgement that they had received the employee handbook, but there was no evidence that either employee had ever signed the arbitration agreement referenced in it. (*Ibid.*)

The court concluded that the documents submitted by the defendants did not show that either plaintiff ever consented to binding arbitration: "The arbitration agreement provision in the employee handbook generally states an Arnel policy that '[a]ny dispute arising out of employment with the Company, as allowed by law, will be settled by binding arbitration.' . . . The arbitration agreement provision, however, does not stop there. It also states that pursuant to Arnel's policy, '[a]s a condition of employment, all employees are required to sign an arbitration agreement.' This provision completely undermines any argument by defendants the provision in the handbook itself was intended to constitute an arbitration agreement between Arnel and its employees. The provision further states, '[e]mployees will be provided a copy of their signed arbitration agreement'—thus reinforcing an intent to have employees sign a separate arbitration agreement to effectuate Arnel's policy of arbitrating employment claims. Defendants have not produced any evidence of the existence of such an arbitration agreement signed by either plaintiff.

"Defendants cite *Asmus*[, *supra*,] 23 Cal.4th 1, 11 . . . and *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637 [69 Cal.Rptr.2d 300], for the proposition that '[i]n order [to] establish that [plaintiffs] assented to the arbitration agreement, it is only necessary for [defendants] to show that [plaintiffs] received a copy of the agreement and that [plaintiffs] continued to work after they received a copy of the agreement.' Significantly, however, neither *Asmus* nor *DiGiacinto v. Ameriko-Omserv Corp.* addressed whether an arbitration agreement *existed* between an employer and employee.

"*Asmus, supra,* 23 Cal.4th 1, arose in the context of an employer's discontinuance of a management employment security policy but did not involve an arbitration agreement. In *Asmus*, the California Supreme Court addressed the issue whether ' "[o]nce an employer's unilaterally adopted policy—which requires employees to be retained so long as a specified condition does not occur—has become a part of the employment contract, may the employer thereafter unilaterally [terminate] the policy, even though the specified condition has not occurred?" ' (*Id.* at pp. 5–6, fn. omitted.) In holding an employer could do so, the Supreme Court recognized that 'California law permits employers to implement policies that may become unilateral implied-in-fact contracts when employees accept them by continuing their employment.' (*Id.* at p. 11.) In *Asmus*, both parties agreed that the employees had accepted a unilateral contract by their performance. (*Ibid.*) Thus, the question in *Asmus* was whether the unilateral contract, once formed, could be unilaterally modified or terminated by the employer. (*Ibid.*)

"In contrast, the core issue in this case, as framed by the motion to compel arbitration, is whether the documents prepared by Arnel show an express *bilateral* contract was entered into through which the parties agreed to arbitrate. As discussed *ante*, the documents do not. At oral argument on appeal, defendants argued plaintiffs accepted a unilateral contract to arbitrate by continuing to work for Arnel after their receipt of the employee handbook. But, as discussed *ante*, the employee handbook's arbitration provision only placed plaintiffs on notice that they would be called upon to sign a separate binding arbitration agreement, thereby contradicting defendants' argument the provision in the handbook and subsequent performance constituted a unilateral contract of binding arbitration. Defendants' argument on appeal does not withstand legal or factual analysis . . . . The arbitration agreements are expressly *mutual*—compelling both [p]laintiffs and [d]efendants to arbitrate 'Any dispute arising out of employment with the Company.' [¶] . . . [¶] . . . *Asmus* . . . [is] inapposite because, as discussed *ante*, the arbitration agreement provision contained in the employee handbook here placed plaintiffs on notice that they would be required to enter into a separate arbitration agreement with Arnel. As this record shows, neither plaintiff entered into an arbitration agreement." (*Mitri, supra*, 157 Cal.App.4th at pp. 1170–1172.)

The *Mitri* court also distinguished its case from *Brown & Root*: "In their reply brief on appeal, defendants also cite *Craig v. Brown & Root, Inc., supra*, 84 Cal.App.4th 416, 420, in which the appellate court rejected an employee's contention the evidence was insufficient to show she entered a binding arbitration agreement with her employer. The court cited evidence the employer sent the employee a memorandum informing her of the employer's new dispute resolution program, emphasized 'IT APPLIES TO YOU,' and explained '[i]t will govern all future legal disputes between you and the Company.' [Citation.] Unlike the arbitration agreement provision in the Arnel employee handbook, the memorandum in *Craig v. Brown & Root, Inc.*, established in and of itself the employer's dispute resolution program, and did not include an express requirement that its employees sign an arbitration agreement. Therefore, *Craig v. Brown & Root, Inc.*, is inapposite." (*Mitri, supra*, 157 Cal.App.4th at p. 1172.)

In the present case, as in *Mitri*, the employee handbook did not purport unilaterally to impose an arbitration agreement on its employees; instead, it urged employees to agree to submit to arbitration and to sign a representation that ". . . I have entered into the Agreement voluntarily . . . ." Under these circumstances, the trial court properly inferred from Gorlach's election *not* to sign the arbitration agreement that she did not intend to be bound by it.

## DISPOSITION

The order denying the petition to compel arbitration is affirmed. Gorlach shall recover her costs on appeal.

Epstein, P. J., and Manella, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 23, 2013, S206821.