Filed 2/18/14  Holman Professional Counseling Centers v. Keenan & Assocs. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| HOLMAN PROFESSIONAL COUNSELING CENTERS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KEENAN & ASSOCIATES, <br><br> Defendant and Appellant. | B245127 <br><br> (Los Angeles County <br> Super. Ct. No. LC097826) |

APPEAL from an order of the Superior Court of Los Angeles County, Maria E. Stratton, Judge.  Reversed with directions.

Kinsella Weitzman Iser Kump & Aldisert, Dale F. Kinsella and Alan Kossoff for Defendant and Appellant.

Law Offices of Jonathan W. Biddle, Jonathan W. Biddle; Woolls & Peer and H. Douglas Galt for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Keenan & Associates (Keenan) appeals from an order denying its motion to compel plaintiff Holman Professional Counseling Centers (Holman) to arbitrate. We conclude that Keenan, an agent of a party to the arbitration agreement, can enforce the arbitration agreement against Holman, a signatory to the agreement. We also find that Holman's claims are subject to the arbitration agreement. Therefore, we reverse.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Complaint*

1. The Allegations

Holman is a corporate provider of inpatient and outpatient psychiatric, drug and alcohol, and employee assistance program services in California. Keenan is an insurance consulting and brokerage firm that provides insurance products and services to schools, community colleges, health care organizations, and municipalities, including employee benefits and health benefit management services.

In the fall of 2009 Keenan learned that one of its clients, the Riverside County School District, through its Riverside Employer/Employee Partnership for Benefits (REEP), needed a new provider of psychiatric care for its employees. On behalf of REEP, Keenan asked various psychiatric health care providers, including Holman, to submit a proposal to provide services to REEP.

Representatives of Holman and Keenan met on January 26, 2010 "to discuss Holman's ability to provide services on behalf of REEP." Debra Yorba, senior vice president of Keenan and the account representative for REEP, chaired the meeting. In response to Yorba's inquiry regarding Holman's ability to handle the REEP account, "Holman's representatives stated that Holman's past experience indicated that it could provide the services for REEP."

2

Holman asked for information about REEP's prior claims experience, explaining that "the request for proposal lacked any prior claims data which Holman needed in order to come up with a realistic quote/bid for REEP." "Yorba ignored Holman's concern about REEP's prior claims experienced with [its prior provider] PacifiCare and stated that Keenan and REEP would be in a partnership with Holman and that their goal was to make a long term commitment; and that if the vendor (Holman) needed to revise their quote/bid based on their claims experience with REEP, they (Keenan and REEP) would be open to revising/renegotiating the amount paid to Holman after Holman was performing services to REEP." Yorba stated "that Keenan would make sure that REEP would increase the rates paid based upon the current claims experience during the term of the contract if the starting rate was not sufficient based upon the new utilization rates or if any other data . . . supported the need for an increase in the premium to be paid to Holman." "Throughout the period of time that Holman bid for providing services to REEP up until the time that the Group Contract between REEP and Holman was finalized, Holman's representatives dealt exclusively and solely with Yorba and other Keenan associates who acted and negotiated on behalf of REEP."

### 2. The Contract

The Group Contract between Holman and REEP was finalized on July 21, 2010. Holman signed the agreement; REEP did not.[1] "Section 3.10 of the Group Contract provides that Holman could increase the premiums to be paid by REEP after giving proper notice."[2] Paragraph 7.16 of the Group Contract, entitled "REEP/Holman

---

[1]     Holman did not attach the Group Contract to its complaint. Keenan, however, attached a copy to its motion to compel arbitration. The copy of the Group Contract in the joint appendix is not signed. The listed signatories are Michael Boyd, president of REEP, and Ron Holman, president of Holman.

[2]     Section 3.10, which related to the increase or decrease of premiums and benefits, states: "Holman shall not increase the amount of the Premium to be paid by REEP, or otherwise increase the compensation to be paid to Holman by REEP for services

3

Arbitration," states:  "Any controversy or claim arising out of or relating to this contract, including any claims for tort liability, bad faith liability, breach of contract, punitive damages or any other claim, but excluding medical malpractice claims by Enrollees, shall be submitted to binding arbitration before the American Arbitration Association. Arbitration must be initiated within six months after the alleged controversy or claim occurred by submitting a written demand to the other party.  The failure to initiate arbitration within that period constitutes an absolute bar to the institution of any proceedings."  Paragraph 7.16.5 provides that "[b]y entering into this Contract, REEP and Holman waive their legal rights to have any dispute decided in a court of law before a judge or jury and instead accept the use of arbitration for resolving disputes arising from this Group Plan Contract."

The Group Contract includes an integration clause.  Paragraph 7.9 provides:  "This Group Plan Contract contains all of the provisions of the agreement between the parties hereto, and no promise or agreement not contained herein shall be binding on the parties unless the same is mutually agreed upon in writing, signed by the parties hereto and attached to this Group Plan Contract.  Only an officer or director of Holman has the power to change, modify, or waive the provisions of this Group Plan Contract, and then only in writing.  Consent of Enrollees is not required to effect any such change."

provided pursuant to this Group Plan Contract, except after a period of at least ninety (90) days from either 1) the postage paid mailing to REEP's business address, or 2) by hand delivery of the written notice of such increase to REEP by Holman.  Holman shall not decrease the amount of benefits to be provided pursuant to this Group Plan Contract except after a period of at least thirty (30) days from either the postage paid mailing to REEP, or by hand delivery to REEP of a written notice of such decrease."  A footnote to this section further specified that "[s]hould the actual enrollee count vary by 10% from the original proposed enrollee count, Holman reserves the right to alter the rate accordingly."

3.    Performance

In reliance on Keenan's representations and the terms of the Group Contract, Holman "began to perform services on behalf of REEP and its employees in July 2010."[3] From the outset the claim rates experienced by Holman were higher than and out of proportion to what Keenan had represented.  It quickly "became clear that Holman could not sustain its business if it continued to operate and perform for REEP under the originally quoted rate."  Therefore, "Holman contacted Keenan and REEP [per the provisions of the Group Contract and prior promises made by Keenan] and requested an increase in the premium rates from REEP."  Although Keenan told Holman it would meet and confer about Holman's request, "Keenan put off discussions and meetings about the requested premium increase."

Holman wrote to Yorba in "March and April 201[1]," informing her "of the need to increase the premium rates charged to REEP under the terms of the Group Contract."  Yorba responded on April 22, 2011, stating, "You (Holman) should be aware that REEP cannot simply agree to increase the premium rates because the quoted rates have been accepted by REEP members and are a part of their annual budgeting process."

On May 10, 2011 Holman advised REEP and Keenan in writing that it was "terminating the Group Plan Contract due to REEP's refusal to pay the increased premiums mid contract as provided for in the Group Contract."  On May 13, 2011 Michael F. Boyd, the president of REEP, responded to Holman:  "Your decision NOT to honor the <u>rate</u> <u>guarantee</u> and increase premium mid contract, force plan design changes, or both, left REEP with no alternative."  Boyd also informed Holman "that Keenan would

---

[3]    Holman alleged that "Keenan never presented the Group Contract to REEP for REEP to sign.  In fact, the Group Contract was never signed by REEP.  Holman on the other hand signed the Group Contract with the good faith belief and detrimental reliance that there was a contractual relationship by and between REEP and Holman as of July 21, 2010 based upon statements and representations made by Keenan and as evidenced by Holman's correspondence and revisions and the finalization of the Group Contract Holman received from Keenan."

5

continue[] to act 'on behalf of REEP' in the termination process." Boyd sent Yorba a copy of his letter to Holman.**4**

Holman responded to Boyd's letter on May 18, 2011. Holman stated, "We stand by our position that REEP failed to pay its premiums in an accurate and timely manner. . . . Upon discovery that REEP has not been paying the premiums to which the parties agreed <u>as negotiated</u>, we made every effort to discuss the matter with your representatives (Keenan), but without success." On May 25, 2011 Holman again wrote to Boyd, stating that "[t]his entire matter involves a dispute over the amount of premium payments Holman is entitled to receive <u>under our agreement with REEP and its agent, Keenan and associates, and failed discussions regarding premium increase</u>."

4.      The Causes of Action

Holman alleged eight causes of action. In its first cause of action for breach of fiduciary duty Holman alleged that in July 2010 Keenan "acted as a dual agent" for Holman and REEP and that, in its capacity as Holman's agent, Keenan owed Holman a duty to disclose fully "any and all material facts that could have or might affect [Holman's] decision to perform services on behalf of REEP and its employees as set forth in the Group Contract." Holman further alleged that Keenan breached its fiduciary duty to Holman by failing "to investigate and live up to the promises and representation it made to Holman concerning Holman's ability to increase the premium/rates to REEP during the term of the contract," resulting in loss of revenue from the Group Contract and other financial damage. From July 2010 through February 2011 Holman paid Keenan $184,041.98 in commissions "pursuant to the terms of the agency agreement" between it and Keenan.

---

**4**      Holman alleged that Boyd's letter "was in fact written by Keenan and Associates and is proof that REEP did not understand or was kept in the dark concerning the actual negotiations and finalization of the terms of the Group Contract."

In its second cause of action for fraud and misrepresentation, Holman alleged that when Keenan negotiated with Holman on behalf of REEP, Keenan misrepresented "that REEP would and did agree to renegotiate the premium rates as set forth in the terms and conditions of the Group Contract." Keenan knew its statements were false and made "with the intent to deceive and induce Holman to perform services for REEP based upon said statements which were confirmed in writing and stated in the Group Contract." Holman further alleged that Keenan's representations "were made without any reasonable ground for believing that they were true or that REEP . . . intended to keep the promises" it made to Holman. In addition, Keenan made these promises with the intent of inducing Holman to contract with REEP "and perform services at a reduced rate of premium which [Keenan] knew REEP would never re-negotiate during the term of the Group Contract." Holman alleged that in justifiable reliance on Keenan's misstatements it entered into a contract with REEP to its detriment, resulting in damages including lost revenues from the Group Contract.

Holman's third cause of action alleged a breach of the duty to disclose. Holman alleged that before the terms of the Group Contract were finalized and before Holman undertook to perform under the terms of the Group Contract, Keenan knew that REEP would not agree to an increase in premiums. Holman alleged that because of Keenan's "fraudulent failure to disclose," Holman agreed to perform under the Group Contract and later suffered loss of economic benefits from the Group Contract and other damages.

In its fourth cause of action for negligent misrepresentation Holman alleged that Keenan misrepresented "that REEP would and did agree to renegotiate the premium rates as set forth in the Group Contract." Holman alleged that Keenan made the misrepresentation without a reasonable basis for believing it to be true and with the intent to induce Holman's reliance on the misstatement of fact and that Holman justifiably relied on the false statement. Holman alleged that Keenan's statements caused it "to agree to form a contractual relationship with REEP and to perform services on behalf of REEP to its own future detriment."

7

Holman's fifth cause of action for breach of fiduciary duty—constructive fraud—alleged that, as Holman's agent, Keenan owed Holman "a fiduciary duty to make the fullest disclosure of all material facts that might affect [Holman's] decision to perform services on behalf of REEP and its employees." Holman "was unaware of the existence of any facts that REEP never intended to abide by the terms of the Group Contract and allowed Holman to negotiate with REEP for an increase in the premiums to be paid by REEP employees." As a result, Holman sustained economic damages including loss of revenue from the Group Contract.

In its sixth cause of action for interference with prospective economic advantage Holman alleged that Keenan "by its own actions created and knew that a contractual relationship with REEP would create an economic relationship between [Holman] and REEP that contained the probability of a future economic benefit to [Holman]." Keenan had direct knowledge of this economic relationship, and its wrongful acts "were designed to disrupt this relationship." Keenan's "refusal to abide by the terms of the Group Contract and renegotiate the premium rates or allow [Holman] to renegotiate directly with REEP were intentional wrongful acts that caused the disruption of the relationship between the parties and caused Holman to terminate its services on behalf of REEP and its employees." Holman alleged in its seventh cause of action for interference with economic advantage that Keenan's "negligent and intentional wrongful acts were designed to and did disrupt the relationship between Holman and REEP," of which Keenan had direct knowledge.

In its eighth cause of action for breach of contract Holman alleged that in "July 2012 [*sic*]" Holman entered into a written agreement with Keenan under which Keenan was to act as Holman's agent "for the purpose of [Holman] performing services on behalf of REEP."[5] From July 2010 to February 2011 Holman paid Keenan $184,041.98 in

---

[5] The parties also refer to this contract as the "Agent Agreement." Holman submitted this agreement in opposition to the motion to compel arbitration but did not attach it to the complaint. The Agent Agreement states that the parties are entering into

8

commissions. Holman alleged that Keenan breached the agreement "by failing to allow [Holman] to renegotiate the premiums to be paid to REEP, forcing [Holman] to terminate its contract with REEP and securing other provider services for REEP from . . . a direct competitor of [Holman]."

Holman alleged that as a direct result of Keenan's conduct Holman lost "operating costs, earnings, profits, benefits and other perquisites, including the economic benefits it would have received" if Holman had not terminated the Group Contract. In its second, fourth, sixth and seventh causes of action Holman alleged that Keenan acted with oppression, fraud and malice and in reckless disregard to Holman's rights and "potential exposure to great economic damages."

B.    *Keenan's Motion To Compel Arbitration Under the Group Contract*

Keenan filed a motion to compel arbitration, relying on the arbitration provision in the Group Contract. In his supporting declaration, Keenan's general counsel, Norman Gritsch, stated that "Keenan is an insurance consulting and brokerage firm that provides various products and services to its clients. One of Keenan's clients is [REEP]." Gritsch stated that he "oversee[s] our legal department and assist[s] with the contracts that Keenan negotiates for its clients, such as REEP. In 2010, Keenan negotiated and finalized a written Group Contract . . . with Holman . . . whereby Holman would provide services to REEP and receive compensation for those services. Thereafter, the parties performed services and acted pursuant to the provisions in the Group Contract." Gritsch attached a copy of the Group Contract to his declaration.

the agreement "as of 7/1/2010." Thus it appears that Holman's reference in its complaint to July 2012 was an error.

The unsigned Agent Agreement also contained an arbitration clause. It states, "Arbitration: Except as otherwise provided herein, any controversy or claim arising out of or relating to this agreement, including any claims for tort liability, bad faith liability, breach of contract, punitive damages or any other claim shall be submitted to binding arbitration before the American Arbitration Association." Keenan did not move to compel arbitration under the Agent Agreement.

9

In opposition to the motion, Holman argued that all of its claims against Keenan arose out of the Agent Agreement, not the Group Contract. Counsel for Holman, Jonathan Biddle, attached to his declaration an unsigned copy of the "Agent Agreement between Holman and Keenan and Associates entered into on July 1, 2010," and offered his opinion that the Agent Agreement "forms the basis for all eight of the Causes of Action alleged against Keenan." Biddle further stated that Holman did not sue REEP and that "the Group Contract between REEP and Holman has nothing to do with this lawsuit and cannot form the basis to support Keenan's Motion to Compel Arbitration in this case." Biddle then stated that "[t]he Agent Agreement is the only agreement Holman alleges was breached and which provides the legal foundation and basis for most if not all of the allegations in the Complaint."

C.    *The Trial Court's Ruling*

On October 23, 2012 the trial court denied Keenan's motion to compel arbitration. The court concluded: "The controversy in this case does not arise out of or relate to the contract between [Holman] and REEP; rather it arises out of duties allegedly owed to [Holman] by defendant Keenan under their own separate relationship. Therefore, the court finds that the parties did not agree to arbitrate this particular dispute. [¶] Moreover, the language of the REEP contract itself does not support the proposition that unauthorized misrepresentations by defendant Keenan are issues subject to the arbitration clause. The contract clearly contemplates that arbitration is intended to resolve disputes between REEP and [Holman] over REEP and [Holman's] performance under the contract. There is no such dispute alleged in this action." The trial court also referenced the general rule that a nonsignatory is not bound by an arbitration agreement. Although the court noted that there were limited exceptions to this general rule, the court concluded that none applied in this case. Keenan timely appealed.

**DISCUSSION**

The questions in this appeal are whether Keenan, a nonsignatory to the Group Contract, can enforce the arbitration provision against Holman, a signatory to the Group Contract, and whether Holman's claims against Keenan arise out of or relate to the Group Contract. We answer both questions in the affirmative.

A. *Law Governing Arbitration and Standard of Review*

Public policy strongly favors arbitration. (*Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 701.) Because the right to arbitration is contractual (*Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1128; *DMS Services, Inc. v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352), the policy favoring arbitration "'does not extend to those who are not parties to an arbitration agreement . . . .'" (*Goldman v. SunBridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1176; *DMS Services, Inc.*, *supra*, at p. 1352). Thus, the general rule is that only a party to an arbitration agreement is bound by and may enforce the agreement. (Code Civ. Proc., § 1281.2; *Ronay Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 837; *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 613.) There are, however, a number of exceptions to this rule. (*Ronay*, *supra*, at p. 838; *DMS Services, Inc.*, *supra*, at p. 1353; *Thomas*, *supra*, at p. 614.) "One such exception," and the only one relevant in this case, "provides that when a plaintiff alleges a defendant acted as an agent of a party to an arbitration agreement, the defendant may enforce the agreement even though the defendant is not a party thereto. [Citations.]" (*Thomas*, *supra*, at p. 614; see *Rogers v. Peinado* (2000) 85 Cal.App.4th 1, 9, fn. 6 [nonsignatory to a contract can compel arbitration by invoking principles of agency], disapproved on another ground in *Brennan v. Tremco, Inc.* (2001) 25 Cal.4th 310, 317.)

A party petitioning the trial court to compel arbitration pursuant to Code of Civil Procedure section 1281.2 "bears the burden of proving by a preponderance of evidence the existence of an arbitration agreement. A party opposing the petition bears the burden

11

of proving by a preponderance of evidence any fact necessary to its defense. [Citation.] The trial court sits as the trier of fact for purposes of ruling on the petition. [Citation.]" (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1308.) "Code of Civil Procedure section 1290.2, which governs petitions to compel arbitration brought in California courts, provides that such petitions 'shall be heard in a summary way in the manner and upon the notice provided by law for the making and hearing of motions . . . .'" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1157.) This "generally means that 'the facts are to be proven by affidavit or declaration and documentary evidence with oral testimony taken only in the court's discretion.'" (*Ibid.*, quoting *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413-414.)

When ruling on a motion to compel arbitration, the trial courts "must first determine whether the parties actually agreed to arbitrate the dispute." (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541; *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59; *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1505.) "In California, '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' [Citations.] Generally, an arbitration agreement must be memorialized in writing. [Citation.] A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement. A signed agreement is not necessary, however, and a party's acceptance may be implied in fact [citation] or be effectuated by delegated consent [citation]. An arbitration clause within a contract may be binding on a party even if the party never actually read the clause. [Citation.]" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)

"'Ordinarily, we review a denial of a petition to compel arbitration for abuse of discretion. [Citation.] However, where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo. [Citation.]' [Citations.]" (*Mendez v. Mid-Wilshire Health Care Center*, *supra*, 220 Cal.App.4th at p. 541.) "We review the trial court's interpretation of an arbitration agreement de novo when, as here,

12

that interpretation does not depend on conflicting extrinsic evidence. [Citations.] Our de novo review includes the legal determination whether and to what extent nonsignatories to an arbitration agreement can enforce the arbitration clause. [Citation.]" (*DMS Services, Inc. v. Superior Court*, *supra*, 205 Cal.App.4th at p. 1352.)

    B.    *Keenan Can Enforce the Arbitration Agreement in the Group Contract as REEP's Agent*

The Group Contract identifies the contracting parties as Holman and REEP. Keenan is not mentioned anywhere in the agreement. Although REEP never signed the Group Contract, Holman signed and performed under it. According to Gritsch, following Keenan's negotiation of the Group Contract, "the parties," namely Holman and REEP, "performed services and acted pursuant to the provisions in the Group Contract." On appeal, Holman does not deny that the Group Contract took effect or that REEP was a party to the contract.[6]

As noted above, "when a plaintiff alleges a defendant acted as an agent of a party to an arbitration agreement, the defendant may enforce the agreement even though the defendant is not a party thereto. [Citations.]" (*Thomas v. Westlake*, *supra*, 204 Cal.App.4th at p. 614.) Holman alleged that Keenan was REEP's agent. Holman alleged that REEP was Keenan's client and that on REEP's behalf Keenan contacted various outpatient psychiatric healthcare providers, including Holman, and requested a proposal.

---

[6]    In its opposition to Keenan's motion to compel arbitration, Holman argued that "the Group Contract is not signed by Keenan, Holman or REEP and has no legal force and effect in this action." In its complaint, however, Holman alleged that it "signed the Group Contract with the good faith belief and detrimental reliance that there was a contractual relationship by and between REEP and Holman as of July 21, 2010 based upon statements and representations made by Keenan and as evidenced by Holman's correspondence and revisions and the finalization of the Group Contract Holman received from Keenan." Holman is bound by the admission in its complaint that it signed the Group Contract. (See *Stueve Bros. Farms, LLC v. Berger Kahn* (2013) 222 Cal.App.4th 303, 318 [admission of fact in a complaint constitutes a judicial admission].)

13

Holman further alleged that "[t]hroughout the period of time that Holman bid for providing services to REEP up until the time that the Group Contract between REEP and Holman was finalized, Holman's representatives dealt exclusively and solely with Yorba and other Keenan associates who acted and negotiated on behalf of REEP." Because Holman alleged that Keenan acted as REEP's agent, Keenan can enforce the arbitration agreement contained in the Group Contract in its capacity as REEP's agent. (See *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418 [nonsignatories "acting as agents for the Rams . . . are entitled to the benefit of the arbitration provisions"]; *DMS Services, Inc. v. Superior Court*, *supra*, 205 Cal.App.4th at p. 1353 [nonsignatories to an agreement containing an arbitration provision may compel arbitration of a dispute arising within the scope of the agreement]; *Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759, 765 [nonsignatory may invoke arbitration agreement "against a party, if a preexisting confidential relationship, such as an agency relationship between the nonsignatory and one of the parties to the arbitration agreement, makes it equitable to impose the duty to arbitrate upon the nonsignatory"]; *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1004 [nonsignatory agent of securities broker is "entitled to the benefit of arbitration as is his principal"].)

Holman acknowledges that Keenan can invoke the arbitration clause in the Group Contract by showing "that the claims against Keenan are in its capacity as REEP's agent performing under the terms of the [Group] Contract" between Holman and REEP. Holman argues, however, that "it is not enough that Keenan was a REEP agent," but that Keenan must also show that its "prospective liability is due to acts committed within the course and scope of that agency." This argument is unavailing. First, because Holman makes this argument the first time on appeal, Holman has forfeited it. (See *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528-1529 [argument not advanced below is waived or forfeited on appeal]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 ["[c]ontentions or theories raised for the first time on appeal are not entitled to consideration" and the exception for questions of law does not apply where the new theory involves factual issues that were

14

not presented below].)  Second, as noted above, Holman alleged specifically and repeatedly that Keenan acted within the course and scope of its agency in negotiating the Group Contract on behalf of REEP.

Third, Holman has not cited any authority for the proposition that a signatory can avoid arbitration with an agent of a party to the agreement simply by alleging that the agent acted outside the course and scope of the agency, or that before an agent can enforce an arbitration agreement against a signatory the agent must first establish that it acted within the course and scope of the agency.  (Cf. *Thomas v. Westlake*, *supra*, 204 Cal.App.4th at pp. 614-615 ["a plaintiff's allegations of an agency relationship among defendants is sufficient to allow the alleged agents to invoke the benefit of an arbitration agreement executed by their principal"].)  Were this the rule, "arbitration agreements could be avoided by the form of pleadings."  (Knight, et al., California Practice Guide: Alternative Dispute Resolution, ¶ 5:227.)

The cases cited by Holman are distinguishable.  *Benasra v. Marciano* (2001) 92 Cal.App.4th 987 involved the issue whether a signatory could enforce an arbitration agreement against a nonsignatory who signed the agreement solely in his capacity as a corporate officer on behalf of the contracting corporation.  This case involves a nonsignatory agent enforcing an arbitration agreement against a signatory.  *RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511 involved domestic battery charges between officers of two different corporations.  The court held that an arbitration provision in a contract between the two corporations did not apply to the individual's battery claim.  The court noted that "it cannot seriously be argued that the parties intended [the arbitration provision] to cover tort claims arising from an alleged violent physical assault by an employee of one company against an employee of the other in the context of an intimate domestic relationship between them.  Such a possibility could not have been within the parties' contemplation when the language was agreed to, and nothing in the language remotely suggests that it was intended to apply to personal injury tort claims arising outside of the business relationship between" the two corporations.  (*Id.* at p. 1523.)  Holman has provided no reasoned legal argument regarding how *RN*

15

*Solution* supports its position. And *McCarthy v. Azure* (1st Cir. 1994) 22 F.3d 351 involved the distinction between a defendant in his individual and representative capacity. Holman does not explain how this distinction has any relevance here.

### C. *Holman's Claims Arise Out of and Relate to the Group Contract*

The arbitration provision applies to "[a]ny controversy or claim arising out of or relating to this contract, including any claims for tort liability, bad faith liability, breach of contract, punitive damages or any other claim, but excluding medical malpractice claims by Enrollees . . . ." Holman does not dispute that its claims arise out of or relate to the Group Contract.[7]

And rightfully so. The allegations of Holman's complaint were replete with allegations of how its claims arise out of or are related to the Group Contract. Among the more than 35 references in the complaint to the Group Contract, Holman alleged that Holman and Keenan drafted the Group Contract, Holman signed and "geared up and began to perform" under the Group Contract based on Keenan's representations, Holman met and conferred with Keenan to discuss increasing the premium rates Holman would receive under the Group Contract, and statements by Keenan representatives "contradicted the terms of the Group Contract." Holman alleged that Keenan breached its fiduciary duty by not living up to its promises about Holman's ability to increase the premium rates under the Group Contract, and committed fraud, deceit, and negligent misrepresentation by falsely stating that REEP would "renegotiate the premium rates as set forth in the terms and conditions of the Group Contract" and by not disclosing that REEP "never intended to abide by the terms of the Group Contract . . . ." Holman also alleged that Keenan interfered with the economic relationship between Holman and REEP by "refus[ing] to abide by the terms of the Group Contract and renegotiate the premium rates or allow [Holman] to renegotiate directly with REEP . . . ." Even in its

---

[7]     Holman argues only that Keenan's argument "that the controversy between it and Holman arises out of the [Group Contract] . . . is premature."

16

eighth cause of action for breach of the (unsigned) Agent Agreement, Holman alleged that Keenan breached the contract by not allowing Holman to renegotiate premiums under the Group Contract and forcing Holman to terminate the Group Contract. Holman alleged generally that its dispute with Keenan was about the amount of premium payments Holman was entitled to receive under the Group Contract, and claimed for all eight of its causes of action that its damages included the earnings, profits, benefits, and other revenues "it would have received . . . under the terms of the Group Contract." As Holman states in its opening brief on appeal, Holman is "claiming that Holman had suffered damages under the Group Contract."[8]

Because Holman's claims against Keenan, whether they arose during the negotiation, or during or after performance, of the contract unquestionably relate to the Group Contract, they are subject to the broad provision in the Group Contract. (See *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 553, fn. 1 ["[a]n arbitration cause that covers *any claim arising out of or relating to* the contract or the breach thereof 'is very broad'"]; *Berman v. Dean Witter & Co., Inc.*, *supra*, 44 Cal.App.3d at p. 1003 ["[t]he phrase 'any controversy . . . arising out of or relating to this contract . . .' is certainly broad enough to embrace tort as well as contractual liabilities so long as they have their roots in the relationship between the parties which was created by the contract"]; *Collins & Aikman Prods. Co. v. Building Sys.* (2d Cir. 1995) 58 F.3d 16, 20 ["the paradigm of a broad clause" is the phrasing, "'any claim or controversy arising out of or relating to the agreement'"].)

Holman argued below that its claims against Keenan were based solely on the Agent Agreement and therefore the arbitration provision in the Group Contract was inapplicable. Holman, however, did not submit any evidence that the Agent Agreement was executed, enforceable, or performed. Nor did Holman submit any evidence that

---

**8** One of Keenan's primary defenses also arises out of and relates to the Group Contract. Keenan points out that it "will certainly use the integration provision in the Group Contract as a defense against Holman's claims of fraud and misrepresentation."

Keenan was its agent or that Holman paid Keenan commissions pursuant to the Agent Agreement or any other contract.[9]  In any event, Holman's claims were not "based solely" on the Agent Agreement.  They arose out of, related to, and were based almost entirely on the Group Contract.

## DISPOSITION

The order is reversed.  The trial court is directed to vacate its order denying Keenan's motion to compel arbitration and to enter a new order granting the motion and staying the proceedings against Keenan pending the completion of arbitration.  Keenan is to recover its costs on appeal.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

WOODS, J.

---

[9]    At the hearing on the motion to compel arbitration, the trial court asked counsel for Keenan if Keenan had received commissions under the unsigned Agent Agreement. Counsel replied, "No.  We're not alleging we received commissions under this agreement."  When the court then asked, "You received no commissions ever at all under any agreement?" counsel responded, "Not under this agreement" or any written agreement.  Counsel for Keenan stated that Keenan received commissions under an oral understanding and that Keenan never received the Agent Agreement.

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.