[No. B200340. Second Dist., Div. Three. July 22, 2008.]

Estate of LOUIS J. BONANNO, Deceased.
JEAN BONANNO, Petitioner and Respondent, v.
JACQUELINE BONANNO CONNOLLY, as Administrator, etc., Objector
and Appellant.

**COUNSEL**

Fullerton, Lemann, Schaefer & Dominick and Thomas W. Dominick for Objector and Appellant.

Overton, Lyman & Prince and Stephen L. Jones for Petitioner and Respondent.

**OPINION**

**ALDRICH, J.—**

I.

### INTRODUCTION

A man died intestate. His daughter, girlfriend of 12 years, and his estranged wife, all claimed portions of his estate. The three resolved their disputes in a written settlement agreement. Thereafter, the wife filed petitions pursuant to Probate Code section 13650, asking that her share of the estate (as delineated in the settlement agreement) pass to her *without* administration and be confirmed as property belonging to her as surviving spouse pursuant to Probate Code section 13500. The probate court granted the surviving wife's petitions.

The effect of the probate court's ruling does not alter the distribution of the estate property as delineated in the settlement agreement. Rather, it reduces the administration commissions that are to be paid to the daughter, who acted as estate administrator for years, and reduces the attorney fees that are to be paid to the estate's attorney, who acted as the estate's attorney for years.

The daughter, as the administrator of the estate, appeals from the probate court's ruling. We reverse, holding that the estranged wife is estopped from asserting her statutory rights to have her share of the decedent's property pass to her without administration.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Initial facts*

Louis J. Bonanno (Louis) died intestate on March 12, 2003. He was survived by (1) his estranged wife, Jean Bonanno, also known as Inagene Bonanno (Jean), from whom he had been separated for at least 12 years, and (2) his daughter by a prior marriage, Jacqueline Bonanno Connolly (Connolly). At the time of his death in California, Louis and Jean were parties to an action for dissolution of marriage. Jean lived in Iowa.[1]

For many years prior to, and at the time of his death, Louis was living with Jacqueline S. Stevens (Stevens).

### B. *The probate petitions and oral settlement*

On April 3, 2003, Connolly filed a petition to probate her father's estate and for issuance of letters of administration to her under the Independent Administration of Estates Act, Probate Code section 10400. As requested, Connolly subsequently was appointed the administrator of the estate.[2] (Prob. Code, § 10403.)

On June 13, 2003, Jean filed a petition claiming that Louis's residence in Studio City, California, was community property and that she was entitled to all property Louis held in joint tenancy and all other property held by Louis. Jean sought an order determining that the record title of Louis's residence, which was held as Louis's separate property, was in fact held in joint tenancy

---

[1] For ease of reference we have used the first names of Louis Bonanno and Jean Bonanno. We mean no disrespect thereby.

[2] Connolly was entitled to priority of appointment over Jean because Jean and Louis were parties to a dissolution proceeding and were not living together at the time of Louis's death. (Prob. Code, §§ 8461, 8463.)

When a man dies and is survived by a spouse and one child, the laws of intestacy provide that the surviving spouse receives one-half of the community property that belongs to the decedent and one-half of the decedent's separate property, and the child receives the other one-half of the decedent's separate property. (Prob. Code, §§ 6401, subds. (a), (c)(2), 6402, subd. (a).)

with her. Jean also sought an order determining that Louis's estate, with the exception of a parcel of property in Pearblossom, California, was community property and therefore was to be distributed to her. As part of her argument, Jean claimed that because Louis had been retired, all accumulated assets at the time of his death was community property. On August 4, 2003, Jean filed a second petition in which she claimed she was entitled to one-half of all property Louis had transferred to Stevens because that property was also community property. Jean asked for orders determining that all gifts to Stevens were "community property and are null and void as to all or one-half of the gift; [and] all property taken by [Stevens] from [Louis] or his Estate, whether before or after [Louis's] death, including moneys from any joint banking accounts, are all, or one-half thereof, the property of [Jean] or the Estate of [Louis] . . . ."[3]

On July 7, 2003, Stevens filed a petition to determine interest in Louis's estate. Stevens's petition was based on a palimony claim in which she contended that a substantial portion of the estate belonged to her pursuant to an oral agreement she had entered into with Louis approximately 12 years prior to his death.

Connolly objected to the petitions of Jean and Stevens. Stevens opposed Jean's petition.

On December 10, 2003, Jean, Stevens, and Connolly, individually and as the representative of the estate, resolved their disputes through mediation. However, Stevens refused to sign a settlement agreement and the settlement was never reduced to writing.

Jean filed a motion for summary judgment seeking to enforce the settlement. (Code Civ. Proc., § 664.6.) In support of the motion, Jean declared that the parties had reached a global settlement, leaving open only the question of extraordinary attorney fees. Connolly joined in the motion. On June 7, 2004, the probate court granted the summary judgment motion ruling that the settlement agreement was valid and binding.

Over the years, Connolly, as administrator, paid creditors claims totaling approximately $250,000. The claims included a money judgment held by a construction company and those submitted by Jean for funeral expenses. Connolly gathered the decedent's estate that included real property, bonds, uncashed checks, furnishings and other items. She filed a lawsuit against Washington Mutual Bank because the bank refused to release $19,000 in

---

[3] The original petition estimated Louis's estate to be worth approximately $600,000. Subsequent information revealed that the estate was worth more than $4 million.

payment on a cashier's check. Connolly prepared tax returns and filed seven inventories of the estate. Over the years, the estate attorney expended more than 240 hours in performing services for the estate.

### C. *The appeal and the written settlement agreement*

Stevens appealed from the probate court's June 7, 2004, summary judgment ruling. (*Stevens v. Bonanno* (May 10, 2006, B177009).) In May 2006, we dismissed the appeal after we were notified that the parties had entered into a nine-page written settlement agreement executed in March 2006.[4]

In the introductory recitals of the March 2006 settlement agreement, Jean acknowledged that she was "seeking a determination of the title to the [Studio City] House [and] of the form of ownership of all personal property in which [Louis] had an interest at the time of his death. [She] claimed that all such personal property was community property." The written settlement agreement also provided that Jean, Stevens, and Connolly, for herself and as the administrator of Louis's estate, agreed to "a full and final settlement of all matters arising out of or in any way related to their respective claims in the Litigation and to the distribution of the Estate."

Pursuant to the terms of the March 2006 settlement agreement, upon the "approval by the Court of this Settlement Agreement and an Order of Final Distribution," the estate was to make the following distributions:

To Stevens—$100,000 in municipal bonds, a car, and the Pearblossom property.

To Connolly, in her individual capacity—$750,000.

To Jean—"The remainder of the Estate," including Louis's home in Studio City, except for the "debts, costs, and fees associated with the administration of the Estate."

The agreement also included the following provisions:

Paragraph 3.d—If additional assets of Louis were retrieved after December 10, 2003, "the net value of the assets so discovered and retrieved shall be distributed seventy-five percent (75%) to [Jean] and twenty-five (25%) to Connolly . . . ."

Paragraph 3.g—"The releases set forth herein between [Jean] and Connolly, in both her individual capacity and in her capacity as administrator,

---

[4] The parties executed the settlement in counterparts on different days.

will be effective upon the Order approving this Settlement Agreement and the final distribution of the Estate pursuant to the terms hereof . . . ."

Paragraph 4.f—Jean was to "bear her own costs and attorney's fees." Connolly did not claim any costs and attorney fees in her individual capacity, but agreed to bear such expenditures if she did incur them. "Connolly, in her capacity as administrator, and her counsel in his capacity as attorney of the administrator, are not hereby precluded from applying for administrator fees and attorney's fees. On the other hand, [Jean was] not precluded from contesting any such application . . . ."

Paragraphs 1.f, 1.g, and 4.h—Stevens and Jean were to dismiss their respective petitions, which had sought different distributions of the estate property.

Paragraph 6—"Except for (a) the obligations created, arising out of, or continuing under this Agreement, and only upon the complete fulfillment and performance of the conditions, promises and obligations contained in this Agreement and (b) the duties to locate, assemble, disclose, and include in the Estate all real and personal property belonging to [Louis] at the time of his death, . . . [Jean] does hereby release and forever discharge Stevens and Connolly, in both her individual and representative capacities, and each of them, from and against any and all claims, demands, debts, liabilities, obligations and causes of action whatsoever of every kind and nature at law, in equity or otherwise, whether known or unknown, suspected or unsuspected, which she ever had or now or in the future may have against any of them."

Paragraph 9—"Subject to the express terms and limitations of this Settlement Agreement, each party expressly waives and relinquishes any and all rights and benefits which she has or may have under Civil Code Section 1542 to the full extent that she may lawfully waive such rights and benefits pertaining to the claims, demands, debts, liabilities, obligations and causes of action hereunto released. . . ."

Paragraph 10—"This Settlement Agreement is entered into by the parties solely for the purposes of compromising and settling the matters in dispute. It does not constitute, nor shall it be construed as, an admission by anyone of the truth or validity of the claims, or any of them asserted in the Litigation."

Paragraph 12—"The parties mutually agree and warrant that each party will not undertake any action which would deprive any other party of any or all of the benefits set forth in, or contemplated by, this Settlement Agreement."

### D. *Jean's spousal property petitions*

On May 16, 2006, Jean filed a spousal property petition pursuant to Probate Code section 13650. She sought a court order seeking a determination that Louis's property was to pass to her *without* administration under Probate Code section 13500, and confirmation that the property belonged to her as surviving spouse under Probate Code sections 100 and 101.[5] Jean alleged, in essence, that all of the assets of the estate, with the *exception* of the assets to be distributed to Stevens and Connolly pursuant to the March 2006 settlement agreement, "were the community property of [Louis] and [her]," to which she was entitled. In a supplemental spousal property petition, Jean contended that other properties were Louis's separate property, that passed to her by virtue of the settlement agreement.

Connolly, as the administrator of the estate, opposed the spousal property petitions. She argued that by executing the March 2006, settlement agreement, Jean had released and discharged all community property claims and had waived, or was estopped from claiming, any rights sought in the spousal property petitions.

On October 10, 2006, Connolly filed a first and final accounting in which she requested $58,245 in statutory commissions for herself as administrator, and that same sum for the estate's attorney as fees. Jean objected to these requests.

On November 13, 2006, Jean filed a motion for summary judgment on her spousal property petitions.

### E. *The probate court's ruling*

Jean's summary judgment motion was heard on February 7, 2007. Jean and Connolly agreed that the issues before the probate court were solely legal in nature and that the entire matter could be resolved on the pleadings.

On March 16, 2007, the probate court granted Jean's summary judgment motion and her spousal property petitions. The probate court held that the property passing to Jean was to do so outside administration. The probate court reasoned that the March 2006 written settlement agreement did not

---

[5] Probate Code section 100, subdivision (a) provides: "Upon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent."

Probate Code section 101, subdivision (a) provides: "Upon the death of a married person domiciled in this state, one-half of the decedent's quasi-community property belongs to the surviving spouse and the other half belongs to the decedent."

constitute a writing specifically evidencing an election (Prob. Code, § 13502) to administer the properties to which she was entitled from Louis's estate; there was no other writing that met the statutory requirement for an election; and the release in the settlement agreement did not preclude Jean from filing a spousal property petition. The probate court further ruled as follows: Jean had not waived her rights to proceed with a spousal property petition as the settlement agreement did not evidence an intelligent and intentional relinquishment of her statutory rights. Further, Jean was not estopped from asserting her rights because neither she nor Connolly had made the agreement clear with regard to Jean's statutory rights and both parties "apparently made assumptions about how the matter would proceed after an agreement was reached in mediation."

On April 30, 2007, the probate court entered orders granting Jean's motion for summary judgment and her spousal property petitions. Connolly, as the administrator of Louis's estate, timely appealed and appears as appellant. Jean appears herein as respondent.

III.

DISCUSSION

A.  *The statutory scheme*

1.  *Probate and the administration of an estate*

■  " 'Probate' is the court-supervised administration of a decedent's estate. It is an *in rem* proceeding over decedent's property in the state (the property being the 'res'). [Citations.]" (Ross, Cal. Practice Guide: Probate (The Rutter Group 2007) ¶ 3:1, p. 3-1 (rev. # 1, 2006).) "The probate court is concerned with passage of title to the decedent's property whether by will or by the laws of intestate succession. ([Prob. Code,] § 7000.) For this purpose '[t]he decedent's property is subject to administration under this code, except as otherwise provided by law.' ([Prob. Code,] § 7001.) 'The basic purposes of administering a decedent's estate are to preserve and protect the estate; to satisfy and discharge all debts and claims, including expenses of administration, that are charges or liens on the property; and to distribute the residue of the property, at a proper time, to those persons who are entitled to receive it.' [Citation.]" (*Estate of Jimenez* (1997) 56 Cal.App.4th 733, 740 [65 Cal.Rptr.2d 710].) Thus, the "[a]dministration of an estate . . . involves ascertaining the nature, extent, and total value of the decedent's property and transferring it to the proper persons, who include creditors and taxing authorities as well as heirs. [Citation.]" (1 Cal. Decedent Estate Practice (Cont.Ed.Bar 2008) § 5.1, p. 5-3.) The duties of "an executor or administrator

in handling an estate . . . are to preserve and protect the estate, to satisfy and discharge all debts and claims and to distribute the residue of the property to those entitled to receive it." (*Estate of Denman* (1979) 94 Cal.App.3d 289, 292 [156 Cal.Rptr. 341].)

Probate Code section 13501 specifies, in part, that "[p]roperty passing to someone other than the surviving spouse under the decedent's will or by intestate succession[,] [¶] . . . [p]roperty disposed of in trust under the decedent's will," and "[p]roperty in which the decedent's will limits the surviving spouse to a qualified ownership" are subject to administration.

> ### 2. *The summary procedure for surviving spouses that bypasses administration*

■ The Probate Code provides for summary procedures that bypass traditional administration. (Prob. Code, § 6600 et seq.) These summary procedures "may reduce expenses and the time required to transfer property to the persons entitled to it." (1 Cal. Decedent Estate Practice, *supra*, § 5.2, p. 5-4.)

The summary procedure in issue in this case is codified in Probate Code section 13500 et seq. It is intended to permit a surviving spouse to obtain a judicial determination of property to which that spouse is entitled and to obtain a judicial confirmation of that property to that spouse without other proceedings. (See generally, 1 Cal. Decedent Estate Practice, *supra*, § 5.31, p. 5-57 et seq.; Ross, Cal. Practice Guide: Probate, *supra*, ¶ 4:53, p. 4-31 et seq.; 14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 818, p. 916 et seq.)

Probate Code section 13500 states, "*Except as provided* in this chapter, when a husband or wife dies intestate leaving property that passes to the surviving spouse under Section 6401, or dies testate and by his or her will devises all or a part of his or her property to the surviving spouse, the property passes to the survivor subject to the provisions of Chapter 2 (commencing with Section 13540) and Chapter 3 (commencing with Section 13550), *and no administration is necessary*." (Italics added.)

■ Pursuant to Probate Code section 13650, the surviving spouse may file a spousal property petition with the probate court to confirm the surviving spouse's interest in property that belongs to the surviving spouse and that passes to the surviving spouse without probate procedures. (Prob. Code, §§ 100, 101.) Such petition also seeks to determine and confirm to the surviving spouse his or her one-half ownership interest in the community property or quasi-community property. (Prob. Code, §§ 13650, subd. (a),

13500, 13502, 13503, 6401.) Further, the petition seeks to determine, and thereafter confirm to the surviving spouse, property that passes to that spouse from the decedent. Thus, it addresses the decedent's interest in the community and quasi-community, the decedent's full interest in his or her separate property, and any rights the surviving spouse may have in the decedent's separate property granted by will or intestate succession. (*Ibid.*)[6]

■ The procedure established in Probate Code section 13650 is voluntary. It is helpful because although property may automatically pass to a surviving spouse without administration (Prob. Code, § 13500), some title companies and others may not clear or transfer title without a court order. Through a Probate Code section 13650 spousal property petition, surviving spouses request a judicial determination and confirmation of their rights to all or a portion of the property to which they are entitled upon the death of their spouse and obtain a court order verifying the same. (Prob. Code, § 13656.)[7]

■ A Probate Code section 13650 petition must be verified on the mandated Judicial Council form that includes all of the information required in Probate Code section 13561. The form may be filed simultaneously with a petition to probate the will or for administration of the estate, or it may be filed separately. (Ross, Cal. Practice Guide: Probate, *supra*, ¶ 4:102, p. 4-49; Prob. Code, §§ 1021, 13650 et seq.; Cal. Rules of Court, rule 7.301; Judicial Council Forms, form DE-221.) The attorney fees for services rendered when a Probate Code section 13650 petition is filed are not established by statute, but "shall be determined by private agreement between the attorney and the client and are not subject to approval by the court." (Prob. Code, § 13660.)

Probate Code section 13650 reads in part: "(a) A surviving spouse . . . may file a petition in the superior court of the county in which the estate of the deceased spouse may be administered requesting an order that administration of all or part of the estate is not necessary for the reason that all or part of the estate is property passing to the surviving spouse. The petition may also request an order confirming the ownership of the surviving spouse of property belonging to the surviving spouse under Section 100 or 101."

### 3. *The election to probate*

■ Spouses may choose to forgo the summary procedures set forth in Probate Code section 13500 et seq. and may *elect* to administer through

---

[6] Since January 1, 2005, the same summary procedures have been extended to domestic partners. (Fam. Code, § 297.5.)

[7] "Arguably, the interest so 'confirmed' is not being 'set aside' because it does not have to be. Nevertheless, as a matter of convenience, the term 'set-aside' is generally used to define both the 'confirmation' of the survivor's own interest and the 'determination' of decedent's interest *passing to* the survivor." (Ross, Cal. Practice Guide: Probate, *supra*, ¶ 4:62.1, p. 4-35.)

probate all or a portion of the community and quasi-community property and a portion of the decedent's separate property, even if the summary proceedings are available. (Prob. Code, §§ 13502, subd. (a), 13650, subd. (b) ["To the extent of the election, this section does not apply to property that the petitioner has elected, as provided in Section 13502, to have administered under this code."].) The election procedure addresses the survivor's one-half interest in the community and separate property, the decedent's one-half interest in the community and separate property, and the decedent's separate property, but not the survivor's separate property.

Probate Code section 13502, subdivision (b) delineates this optional proceeding, which requires "a writing specifically evidencing the election filed . . . within four months after the issuance of letters, or within any further time that the court may allow upon a showing of good cause, and before entry of an order under Section 13656."[8]

There are benefits to surviving spouses who elect, pursuant to Probate Code section 13502, to have the property that will pass to them be administered in probate, even though the summary procedures detailed above are designed to provide a speedier and less expensive procedure to clear and transfer title than the usual probate proceedings. (See Ross, Cal. Practice Guide: Probate, *supra,* ¶ 4:87, p. 4-42 et seq.) For example, a surviving spouse who receives a decedent's property without administration becomes personally liable for decedent's debts chargeable against such property, within limits. (Prob. Code, §§ 13550 et seq., 11446; *Dawes v. Rich* (1997) 60 Cal.App.4th 24, 31 [70 Cal.Rptr.2d 72]; *In re Marriage of D'Antoni* (1981) 125 Cal.App.3d 747, 750 [178 Cal.Rptr. 285].) Another example is that if there is no formal probate, the time in which creditors must file claims is not fixed. In contrast, when a surviving spouse subjects all of the decedent's property to probate administration, liability for the decedent's debts is cut off, the creditors must look solely to the estate to satisfy their claims, and normally creditors have only four months in which to file claims. (Prob. Code, §§ 9100, 13553.)

---

[8] Probate Code section 13502 reads:

"(a) Upon the election of the surviving spouse or the personal representative, . . . all or a portion of the following property may be administered under this code:

"(1) The one-half of the community property that belongs to the decedent under Section 100, the one-half of the quasi-community property that belongs to the decedent under Section 101, and the separate property of the decedent.

"(2) The one-half of the community property that belongs to the surviving spouse under Section 100 and the one-half of the quasi-community property that belongs to the surviving spouse under Section 101.

"(b) The election shall be made by a writing specifically evidencing the election filed in the proceedings for the administration of the estate of the deceased spouse within four months after the issuance of letters, or within any further time that the court may allow upon a showing of good cause, and before entry of an order under Section 13656."

One commentator suggests that the summary procedures provided in Probate Code section 13500 et seq. may not be advisable in other situations, such as where there are estate and income tax considerations, complex creditor issues, and liabilities in excess of the value of the estate. Additionally, the commentator suggests the summary procedures may not be advisable when there is a family business or other investments that the surviving spouse cannot properly manage, the survivor is or may be incompetent, there is a need to pay the survivor a family allowance, and there are "strained family relations and potential problems that would be more readily addressed in a formal probate administration." (1 Cal. Decedent Estate Practice, *supra*, § 5.42, p. 5-73.)

### 4. *The practical consequences of the probate court's ruling*

In Jean's Probate Code section 13650 spousal property petitions, she did *not* suggest that the March 2006 settlement agreement was unenforceable. Nor did she argue that the properties to be distributed to Stevens or to Connolly pursuant to the settlement were community property. Rather, Jean claimed she was entitled to summarily administer her rights as surviving spouse and receive a court order that she was entitled to the property passing to her pursuant to that agreement, free of administration.

The effect of the probate court's order granting Jean's petition was to reduce the size of the estate that would be administered because a substantial portion of the estate would pass to Jean free of administration. This, in turn, reduced the value of the property to be administered by Connolly from more than $4 million to anywhere between $900,000 and $1.3 million. Because statutory administration commissions and attorney fees are computed on the size of the estate subject to administration (Prob. Code, §§ 10800, subd. (a), 10810, subd. (a)), the probate court's ruling resulted in a sizeable reduction of the administration commission and the attorney fees. Assuming the estate that remained to be administered is $1 million, the statutory administrator's commission would be reduced from approximately $58,000 to approximately $23,000, with the same reductions for the statutory attorney fees.

### B. *Jean is estopped from asserting her statutory rights.*

The probate court concluded that Jean was entitled as the surviving spouse to her share of decedent's estate free of administration, as delineated in Probate Code section 13500 because there were no time restrictions in Probate Code sections 13502 and 13560 for filing a spousal property petition. The probate court rejected the argument that the estate was to be probated,

concluding that Jean had not fulfilled the statutory requirements to *elect* to have her share probated, as there was no "writing specifically evidencing the election" within four months after the issuance of letters of administration. (Prob. Code, § 13502.) The probate court also concluded that the March 2006, settlement agreement could not constitute the required election because it was entered into long after the four-month period for filing a Probate Code section 13502 election had expired, and the settlement agreement contained no express language stating that Jean had elected to subject her property to administration. For purposes of discussion, we assume that the probate court's conclusions were correct.

However, the probate court erred in rejecting Connolly's estoppel argument.

■ Estoppel is an equitable argument that deprives another of rights or defenses. (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1024 [72 Cal.Rptr.3d 27].) " 'The venerable doctrine of equitable estoppel or estoppel in pais, which rests firmly upon a foundation of conscience and fair dealing, [fn. omitted] finds its classical statement in the words of Lord Denman: "[T]he rule of law is clear, that, where one by his words or conduct wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is [precluded] from averring against the latter a different state of things as existing at the same time . . . ." [Citation.]' [Citations.]" (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359 [56 Cal.Rptr.3d 591].)

Estoppel is codified in Evidence Code section 623: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." " 'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be [*sic*] acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' [Citations.]" (*Feduniak v. California Coastal Com., supra*, 148 Cal.App.4th at p. 1359.)

"Although estoppel is generally a question of fact, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law. [Citations.]" (*Feduniak v. California Coastal Com., supra*, 148 Cal.App.4th at p. 1360.)

Here, Jean took advantage of, and benefited from, the fact that the estate was administered. Creditors were put on notice that they had a short time within which to file claims, thus lessening the potential burden to the estate. Jean was not personally liable for decedent's debts as the estate was being administered. By having the estate administered, the strained family relations and potential problems were handled under court supervision. Jean acquiesced and allowed the spousal property to be administered by Connolly for years. Further, the estate attorney expended over 240 hours in performing services for the estate. Had the bulk of the property passed to Jean outside of probate, Jean would have been personally responsible for the attorney fees. (Prob. Code, § 13660.)

Connolly accepted the responsibility for acting as administrator, as allowed by Jean. For years, Connolly gathered and inventoried the estate property, ascertaining its value. Connolly acted to preserve and protect the estate. She paid creditors and taxes, opposed Stevens's palimony claims, filed a lawsuit against Washington Mutual Bank, and filed six inventories. All of the estate administration was done by Connolly.

Jean suggests that there was no evidence that she intended to forgo her statutory rights to have the property pass outside of probate. However, the settlement agreement belies this suggestion. Although the settlement agreement never explicitly mentioned Jean's statutory rights to have her share of decedent's property pass to her outside of probate, it did specifically state that Jean was agreeing to have her share of decedent's property pass to her according to the terms of the settlement agreement and upon an "Order of Final Distribution." (Par. 3.) In the settlement agreement, Jean agreed that an order would be entered "approving this Settlement Agreement and the final distribution of the Estate pursuant to the terms hereof." (Par. 3.g.) Thus, Jean was agreeing not only to the characterization of the property, but that her share would pass to her through an order based upon the settlement agreement. No further proceedings would be necessary. The only interpretation of these sections is that Jean had agreed to permit the probate court to enter an order distributing the property pursuant to the agreement, and therefore, Jean was acknowledging that she would not ask that the property to which she was entitled pass to her outside of probate, free of administration.

Jean is estopped from arguing that the property she is to receive is to come to her without probate administration when Connolly has acted as administrator for years. To find otherwise, would be unfair and inequitable to Connolly and to the estate's attorney.

## DISPOSITION

The order is reversed. Jean Bonanno is to bear all costs on appeal.

Croskey, Acting P. J., and Kitching, J., concurred.