Filed 1/27/16  Estate of Verni CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ESTATE OF SAVERIO VERNI, Deceased. | |
| ERLINDA VERNI, | F069765 |
| Petitioner and Appellant, | (Super. Ct. No. 10CEPR00419) |
| v. | |
| NICOLA VERNI, et al., | **OPINION** |
| Objectors and Respondents. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Robert H. Oliver, Judge.

The Law Office of Jeffrey D. Bohn, Jeffrey D. Bohn, Nathan K. Brown and Catherine Dwyer for Petitioner and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Timothy L. Thompson and Nikole E. Cunningham for Objectors and Respondents.

-ooOoo-

After the death of her husband, Saverio Verni, Erlinda Verni filed a petition to set aside the non-probate transfer of community property to a number of trusts that were established before their marriage.  The trustees of those trusts objected on the basis that

Erlinda did not have any community property interest in the trusts' property under the terms of a post-marital agreement that she and Saverio executed approximately three months after their marriage. After a bench trial on the issue of the agreement's validity, the probate court found both that the agreement was valid and the doctrines of laches and estoppel barred Erlinda's claim of invalidity. Erlinda appeals from the resulting judgment, arguing that the agreement is invalid and the probate court's application of laches and estoppel is not supported by substantial evidence. Finding no error with respect to the defenses of laches and estoppel, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Initial Facts*

Saverio died on May 25, 2009. Prior to his death, Saverio was married twice. His first marriage to Leonarda lasted nearly 55 years and resulted in five children. Upon Leonarda's death on July 31, 2000, the couple's assets – a farming business, an office building in Fresno, and several pieces of real property – were divided equally and deposited into the trusts Saverio and Leonarda established for that purpose. Specifically, Leonarda's one-half community property interest in the couple's property passed into the Verni Marital Trust and Verni Family Trust under the Verni Family Trust of 1999, while Saverio's one-half community property interest was transferred to the Verni Survivor's Trust.

In October 2001, Saverio's maid introduced him to Erlinda, who was living in the Philippines. Saverio and Erlinda first communicated by telephone. On November 2, 2001, Saverio traveled to the Philippines to meet Erlinda in person for the first time. Approximately two weeks later, on November 17, 2001, Saverio and Erlinda were married in the Philippines. At the time of their marriage, Saverio was 74 years old and Erlinda was 50 years old.

A few days after their marriage, Saverio returned to the United States, while Erlinda remained in the Philippines. Saverio returned to the Philippines on Thursday,

2.

February 28, 2002.  On the morning of Tuesday, March 4, 2002, Erlinda signed a post-marital agreement (the Agreement) which Saverio had presented to her the prior evening. As pertinent here, paragraph five of the Agreement provides: "<u>Post-Marital Assets and Liabilities</u>. . . . [¶]  Each party's earnings and income during the marriage resulting from the party's personal services, skill, effort, and work, including, but not limited to, any amount contributed by or on behalf of the party to a Keogh, IRA or other "qualified" retirement plan, shall be the separate property of the party and shall be subject to that party's disposition as separate property, in the same manner as if no marriage had been entered into.  Each party acknowledges that but for this Agreement, the earnings and income resulting from the personal services of the other party during the marriage would be community property in which he or she would have a one-half interest, but that by this Agreement those earnings and income are made the separate property of the other party."

Erlinda's signature was notarized by Virgilio Lansang, who was described as a Philippine attorney; Lansang was Erlinda's friend, and attended Erlinda and Saverio's wedding.  Sometime after the agreement was signed, Saverio and Erlinda returned to the United States; the couple lived together in Fresno County, and remained married, until Saverio's death.  Saverio established and funded an annuity for Erlinda worth nearly $500,000.  In addition, pursuant to a bequest, Saverio left Erlinda $200,000 from the Survivor's Trust.

*This Proceeding*

In May 2010, Erlinda filed a petition to set aside the non-probate transfer of community property pursuant to Probate Code section 5021.  She amended the petition once in July 2010 and a second time in October 2010.  In her second amended petition, she alleged that in 2009, Saverio transferred all his property, including her and Saverio's community property, into the Survivor's Trust, Family Trust, and Marital Trust without her consent; that these trusts contained community property from her marriage to

3.

Saverio; and she was entitled to one-half of the community property included in the trusts.

Nicola Verni (Nick), trustee of the Survivor's Trust, and Antonietta R. Verni (Rosa), trustee of the Marital and Family Trusts, (collectively respondents) filed a response to the second amended petition, in which they alleged that Erlinda was not entitled to the funds she was seeking due to the terms of the Agreement that she and Saverio signed.

In September 2011, the parties stipulated to bifurcate the case into two phases: phase one would determine the Agreement's validity, and if the probate court determined the Agreement was invalid, phase two would determine the remaining issues.

A court trial on phase one took place over two days in June 2012. Erlinda testified on her own behalf through a Tagalog interpreter, while Shirley Ann Verni and Leonardo Verni testified for respondents. Certain exhibits, including the Agreement, the parties' marriage certificate, portions of Saverio's passport, respondents' discovery responses, and a declaration of Fred Campbell, were entered into evidence.[1]

The testimony revealed the following. After Erlinda and Saverio's marriage, Saverio returned to the United States for a period of time. When he returned to the Philippines on February 28, 2002, he brought the Agreement with him that his attorneys prepared, which he had signed on February 21, 2002. Saverio's children did not favor the marriage and were concerned that Erlinda would acquire an interest in his property. According to Saverio's son, Leonardo Verni (Dino), Saverio said that he was taking the Agreement to the Philippines and she was "gonna sign it."

---

[1] Except for the Agreement, Erlinda did not designate any of the other exhibits that were entered into evidence for inclusion in the clerk's transcript. At respondents' request, Campbell's declaration was transmitted to this court. The other exhibits are not part of the appellate record.

4.

The Agreement was given to Erlinda the evening before she executed it, which Erlinda claimed was the first time Saverio mentioned it. Erlinda did not read the Agreement at that time and Saverio did not ask her to read it, although he told her it was about his property and her property. Erlinda first testified that she did not ask Saverio what the Agreement was, but she later testified that she asked him what it was and he said she just had to sign it. Erlinda signed the Agreement on March 4, 2002 at Lansang's office, where he notarized it. Erlinda suggested they go to Lansang because she and a friend of hers knew him, but she claimed she did not know whether he was a lawyer and she was not sure at that time whether he was performing notary services. Erlinda claimed she did not ask Lansang any questions and just signed the Agreement.[2] She did not tell Saverio or Lansang that she did not understand the Agreement.

Erlinda did not read the Agreement before signing it because she trusted her husband. Erlinda admitted that Saverio never told her she could not read the Agreement and that she had an opportunity to read it if she wanted to. Saverio did not explain the Agreement to Erlinda before she signed it or advise her to see an attorney, and she did not ask him about it because she was not paying attention to the provisions, as at that time she did not feel the Agreement was taking advantage of her. Saverio did not explain to her that any earnings he had during the marriage would be his separate property. Erlinda testified that no one explained to her, before she signed the Agreement, what her rights were under California law or how the Agreement affected her rights. Before their marriage, Erlinda told Saverio that she did not own any property, except for some clothes and jewelry, or have any money. Erlinda did not feel that she was forced to sign the Agreement or that she was made to sign the Agreement under some sort of threat, such as that Saverio would divorce her if she did not sign.

_____

[2] At trial, Erlinda testified that Lansang was not her friend, but was a friend of her friend, Rebecca Doc. In her deposition, however, she testified that she had known Lansang for "a long time[,]" and her friend was one of his clients.

Erlinda read the Agreement within a few days after she signed it. After reading it, she did not ask Saverio to explain it to her or ask Lansang questions about it. At that time, Erlinda understood some parts of the Agreement.

Erlinda came to the United States for the first time on December 1, 2002. Saverio visited her twice in the Philippines between March and December 2002. During her marriage, Erlinda only worked for Saverio, who gave her checks every two weeks; she did not hold a job anywhere else. Saverio gave her about $1,400 a month as an allowance, which she put in her personal bank account and was the only money she received during the marriage except for some lump sum gifts. Erlinda claimed that after she signed the Agreement, no one explained to her that paragraph five meant that Saverio's earnings while married to her would remain only his property. Before Saverio's death, no one explained to her what her rights would have been under California law had she not signed the Agreement. Erlinda did not know the value of Saverio's estate when he died, and did not know before his death that he had left her $200,000 from his trust.

Erlinda attended four years of high school at the Marinduque Academy in the Philippines, where the classes were taught in English, the assigned reading materials were written in English, and her test questions and answers were in English. After she graduated from high school, she attended one year of college at Luzonian University in the Philippines, where all the classes, except her Spanish class, were taught in English, the tests were given in English, and her test answers were in English. She passed both a business administration class and a science class which were taught in English. She later attended Holy Angel College in the Philippines, where she took secretarial courses, all of which were in English. According to Erlinda, English is the official language of the Philippines.

When she first met Saverio, she spoke to him in English, which was the only language in which they spoke to each other. Erlinda admitted that when she first met

Saverio, she could read English, but claimed she did not understand all of the words. However, she knew how to write in English and admitted writing Saverio letters in English. In 2008, she became a United States citizen, undergoing a written test and interviews in English without the need for an interpreter. According to Erlinda, she and Saverio had a good marriage; Saverio was a good husband and he treated her well. If she ever asked him for money, he would give it to her.

At trial, Erlinda admitted that she was able to read the Agreement, and she read paragraph one of the Agreement into the record. At some point she understood paragraph one of the Agreement, which defined the Agreement's purpose; Erlinda testified that the paragraph meant to her that "his property is his, and my property is mine[,]" and that was the way it would be while they remained married.[3]

It was only after Saverio's death that Erlinda claimed the Agreement was unfair to her because she felt she was entitled to some of his property. While Saverio was alive, however, Erlinda never told Saverio that because she did not want to have problems with him. When Erlinda read the Agreement a few days after signing it she was concerned that she should have some of Saverio's property, but she did not tell Saverio that she objected to the Agreement because she was concerned that it might upset him and he could do what he wanted with his property. She never told him that she did not understand the Agreement. Erlinda admitted that by not telling Saverio that she thought she had a claim to his property, she led Saverio to believe she was not going to make such a claim. Before Saverio's death, she knew he intended to leave her money because she heard him discussing that fact with Fred Campbell, who handled Saverio's investments.

---

[3] Paragraph one states: "Purpose. The parties enter into this Agreement for the purpose of defining their respective property rights. They intend that all property owned by either of them at the time of the marriage shall be the separate property of the party who owns the property."

7.

Saverio's son Dino and his wife Shirley Ann Verni (Ann) lived in a house next to Erlinda and Saverio's house. From time to time, Erlinda would watch Dino and Ann's child. Over the years, she and Ann talked about various things. Erlinda admitted that she told Ann she understood in signing the Agreement that all of Saverio's property was to be kept separate and she would never have an interest in it.

Ann testified that she established a close relationship with Erlinda and they spent a significant amount of time together.[4] Ann believed that Erlinda spoke and understood English very well; she always communicated with Erlinda in English without the need for an interpreter, and Saverio and Erlinda communicated in English. Ann explained that sometimes there "was maybe a minor language barrier," but it was never a problem and if Erlinda did not understand her, Ann made her point and Erlinda "got it." Ann also testified she observed Erlinda read and write in English on countless occasions, and Erlinda always used proper punctuation and grammar. In Ann's opinion, Erlinda had a "really good" command of the English language.

According to Ann, she and Erlinda spoke of the Agreement. Erlinda never indicated to Ann that she did not understand its terms, and she never acted in a way that indicated she believed she had an interest in Saverio's property. Instead, Erlinda repeatedly told Ann that she did not want Saverio's property and would say things like: "It is not mine. It does not belong to me. It is your daddy's. . . . I do not want it. I don't need money." Erlinda never mentioned to Ann that she wanted an interest in Saverio's property after his death, and she told Ann that she thought Dino should get everything because he did all the work. Erlinda did not ever tell Ann that she objected to the Agreement. Ann testified that Erlinda understood that she would not be receiving Saverio's property, businesses, or money those businesses generated.

---

[4] The probate court found Ann's testimony to be credible.

Dino attended a meeting in November 2008 where Campbell, Saverio and Erlinda were discussing annuity contracts. Dino brought out the Agreement, which they reviewed. Erlinda never made a comment about it. At that time, Saverio made Erlinda a beneficiary of one of his annuities, so that his properties and annuities for his children would be totally separate from Erlinda should something happen to him. According to Dino, during the marriage Erlinda always said that the property did not belong to her, but to Dino's parents. Erlinda never told Dino that she felt she should receive more or share in the profits of the family farming business. To Dino's knowledge, before Saverio died, Erlinda never stated that she did not understand the Agreement, that she was forced to sign it, or that she objected to it. Neither Erlinda nor Saverio indicated to him that Erlinda might challenge the validity of the Agreement.

Campbell explained in his declaration that in 2008, he assisted Saverio in changing beneficiaries on five annuities that Saverio owned; his five children were to share equally on four of the five annuities, while Erlinda was established as the sole beneficiary on the fifth annuity. Campbell came to Saverio's house to effect the changes. Campbell explained to Erlinda that as Saverio's spouse, she had to sign the beneficiary change forms, and that she would be receiving approximately $500,000 from one of the annuities. Erlinda asked Saverio what she should do after Saverio died; Saverio told her to see Campbell, who would ensure she received money from the annuity. According to Campbell, Dino came in during the meeting and said he did not believe Erlinda should get any money because she signed a post-marital agreement. Dino went into the other room and returned with the Agreement. While Erlinda was present during this conversation, she never stated she did not understand the Agreement or that she objected to it. To the contrary, Erlinda acknowledged she was not to get any interest in Saverio's property after her death. Campbell also declared that during the time he knew Erlinda, he was always able to communicate with her in English, and based on his observations and dealings with her, he believed she knew how to read and write English.

In her closing brief, Erlinda argued that the Agreement was unenforceable and must be set aside because Saverio had obtained an unfair advantage over her, and therefore the presumption arose that he used undue influence, which presumption was not rebutted. She also argued the Agreement was unenforceable under Probate Code sections 142, 143, and 144, as (1) the Agreement was procured by undue influence and under a mistake of law, (2) she did not have independent legal counsel when she signed the Agreement, and (3) the Agreement did not make a fair and reasonable disposition of her rights at the time of signing. Finally, she argued that respondents could not prevail on their equitable defense of laches because there was no unreasonable delay or prejudice.

Respondents argued in their closing brief that Saverio did not breach any fiduciary duty he owed to Erlinda when they entered into the Agreement, Erlinda should be estopped from asserting the Agreement's invalidity because she led Saverio to believe she had no intention of challenging the Agreement and Saverio would not have given her approximately $700,000 on his death if he knew she intended to object to the Agreement, and Erlinda's claim was barred under the doctrine of laches since she chose not to object to the Agreement until after Saverio's death.

In December 2012, the probate court issued its Tentative and Proposed Statement of Decision, in which it found the Agreement to be valid. Erlinda filed a list of 34 objections to the proposed statement of decision. After considering the objections, the probate court issued its statement of decision on March 14, 2013.

The probate court, as the trier of fact, made the following factual findings: (1) when Erlinda executed the Agreement she had the ability to both read and understand the Agreement; (2) Saverio did not expressly pressure or attempt to influence Erlinda in the Agreement's execution; (3) Erlinda had the opportunity to read and review the Agreement when it was presented to her the evening before, and the day, she signed it, and the opportunity to question Lansang as to the Agreement's plain language, but she did neither; (4) Erlinda understood the Agreement and its effect prior to Saverio's death;

10.

(5) although Erlinda felt she should get some portion of Saverio's property, she never told Saverio that she did not understand the Agreement or that she objected to its terms; (6) Erlinda never told anyone that she was interested in, or anticipated, challenging the Agreement's validity; and (7) Saverio provided for Erlinda by establishing the $500,000 annuity and bequeathing her $200,000.

Based on these factual findings, the probate court found: (1) the Agreement was not procured by way of undue influence; (2) Saverio did not breach any fiduciary duty owed to Erlinda or obtain an unfair advantage over her through execution or enforcement of the Agreement; (3) to the extent there was a presumption of undue influence, it was rebutted by the evidence; and (4) pursuant to Probate Code section 144, subdivision (b), the Agreement was not unconscionable and may be enforced.

The probate court also found that the doctrines of laches and equitable estoppel barred Erlinda from challenging the Agreement's validity. The court found equitable estoppel applied because Erlinda understood the Agreement and its effect, namely that the Agreement discussed separate property and that Saverio's property was to remain his separate property, and while Erlinda felt she should get some portion of Saverio's property, she never told Saverio that she did not understand the Agreement or that she objected to its terms. The probate court found laches applied because Erlinda never asserted she did not understand the Agreement or intended to challenge its validity, and Saverio generously provided for Erlinda through the $500,000 annuity and $200,000 bequest based on his understanding and reliance, through Erlinda's silence, that she understood and consented to the Agreement.

Although the probate court found the Agreement was valid and enforceable, it ruled that a second phase of trial was necessary in order to value the community estate, if any, created between the date of marriage and the date the Agreement was executed. On April 17, 2014, the parties stipulated for entry of judgment in respondents' favor based on

11.

the trustees' affirmation that Saverio did not acquire any community assets or debts between those dates, and Erlinda's intention to appeal the probate court's decision.

## DISCUSSION

We consider only the affirmative defenses of equitable estoppel and laches because the probate court's findings on these issues are dispositive of Erlinda's claims.

*Equitable Estoppel*

Evidence Code section 623 codifies the doctrine of equitable estoppel. It provides: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."

A party claiming an estoppel must prove four elements: (1) the party to be estopped must know the facts; (2) the estopped party must intend that his conduct shall be acted upon, or must act in a way that causes the other party to believe that was his intent; (3) the party asserting estoppel must be unaware of the true facts; and (4) he must detrimentally rely on the other party's conduct. (*Estate of Bonanno* (2008) 165 Cal.App.4th 7, 22 (*Bonanno*).) If an estoppel is established, the estopped party is deprived of applicable rights or defenses. (*Ibid.*) To invoke the doctrine of equitable estoppel, the reliance must be reasonable. (*Brown v. Chiang* (2011) 198 Cal.App.4th 1203, 1227.)

Equitable estoppel is not limited to intentional fraud. Instead, it has been more broadly applied "where the party to be estopped has engaged in inequitable conduct, induced another party to suffer a disadvantage, and then sought to exploit the disadvantage." (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 162, citation omitted.) Estoppel refers to a conceptual pattern first articulated in the courts of equity which, when properly invoked, allows the court to ignore a fact or argument on the ground that allowing it would be intolerably unfair. (*Ibid.*)

12.

Here, the probate court found that Erlinda was equitably estopped from claiming the Agreement was invalid because (1) she understood the Agreement and its ramifications, i.e. that Saverio's property would remain his separate property, (2) although she believed she should get some of Saverio's property, she never told him she did not understand the Agreement or that she objected to it, (3) Saverio did not know that Erlinda did not understand the Agreement or objected to it, and (4) in reliance on Erlinda's silence, Saverio provided for Erlinda through the annuity and bequest.

On appeal, Erlinda contends the probate court erred in finding estoppel applied because there is no evidence to support the first and second elements. As to the first element, she asserts there is no evidence to support the trial court's finding that she knew the facts because she was never told she had a basis for objecting to the Agreement or of the legal rights she was giving up by signing it. As to the second element, she asserts there is no evidence that she intended Saverio to rely on her conduct or that Saverio's reliance was reasonable.

These are challenges to sufficiency of the evidence to support the trial court's findings. (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 484 (*City of Hollister*) [on challenge to trial court's ruling that the defendant was estopped from raising a defense, substantial evidence standard of review applied to issue of whether the evidence before the trial court was sufficient to establish the facts that court found].) The standard of review in this context is well-settled. We review the entire record in the light most favorable to the prevailing party to determine whether there is substantial evidence to support the trial court's findings. We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the trial court's findings, keeping in mind that "substantial evidence is evidence of ponderable legal significance." (*In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 931.) However, "'we have no power to judge ... the effect or value of the evidence, to weigh the evidence, to consider the credibility of the

13.

witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200.)

"'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*).) The judgment is presumed to be correct. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) And we presume that the record contains evidence to sustain every finding of fact. (*Foreman, supra,* 3 Cal.3d at p. 881.) It is the appellant's burden to demonstrate that it does not. (*Ibid.*)

In furtherance of its burden, the appellant has the duty to fairly summarize the facts in the light most favorable to the judgment. (*Foreman, supra,* 3 Cal.3d at p. 881.) This means that the trial evidence must be summarized in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference, and resolving any conflicts in support of the verdict. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) A recitation of only the appellant's evidence is not a fair summary for purposes of determining whether inferences drawn by the trier of fact are reasonable and supported by substantial evidence. (*Foreman, supra,* 3 Cal.3d at p. 881.) An appellant's failure to provide a fair and complete summary of evidence supporting the judgment results in forfeiture of contentions based on sufficiency of the evidence. (*Ibid.*)

In her argument, Erlinda entirely ignores the probate court's findings on the elements of estoppel that she now claims are unsupported by the evidence. She fails to set forth in her brief all the material evidence on these points. Instead, she simply asserts there is no evidence she was apprised that she had a legal basis for objecting to the Agreement or the legal rights she gave up, and no evidence that she intended Saverio to rely on her conduct or that his reliance was reasonable. However, she does not discuss the evidence that supports the probate court's express findings that she understood the

14.

Agreement and its legal effect, that she never told Saverio that she did not understand the Agreement or that she objected to it even though she felt she should get a portion of Saverio's property, and Saverio ensured that Erlinda was provided for monetarily after his death.

We note that these findings are fully supported by the evidence that (1) Erlinda was capable of reading and understanding the Agreement, (2) she admitted she had the opportunity to read the Agreement before signing it and that she did read it a few days after signing it, (3) the Agreement expressly stated what rights she was giving up, (4) she testified that she did not thereafter ask anyone to explain the agreement to her, (5) she testified that she understood the Agreement discussed separate property and Saverio's property was to remain his separate property, (6) she testified she told Ann that she understood the Agreement provided that she would never have an interest in Saverio's property, and (7) Ann testified that Erlinda understood she would not be receiving Saverio's property, businesses or money generated from those businesses. Moreover, the evidence shows that while Erlinda felt she should receive a portion of Saverio's property, she never told Saverio that because she did not want to worry or upset him; before Saverio's death, she knew he intended to leave her money, yet she said nothing; Saverio had no reason to know that Erlinda would challenge the Agreement after his death; and, in reliance on her silence, he left her the $500,000 annuity and $200,000 bequest.

Erlinda does not contend that the facts the probate court found were not a legally sufficient basis for an estoppel; she does not argue either that an estoppel cannot lawfully arise from the facts the court found, or that the court abused its discretion in deciding to impose an estoppel. (See, *City of Hollister*, *supra*, 165 Cal.App.4th at p. 483 [explaining that a challenge to the trial court's application of estoppel presents two major questions: (1) whether the facts the trial court found furnished a legally sufficient basis for an estoppel, which turns on whether an estoppel can lawfully arise from the factual findings and whether an estoppel should be imposed in view of competing considerations of

15.

fairness and policy; and (2) whether there was sufficient evidence to establish the facts the trial court found].)  By her failure to set forth the evidence that supports the probate court's decision, Erlinda has forfeited her substantial evidence argument and, even if not forfeited, substantial evidence supports the probate court's findings.

*Laches*

For this same reason, her challenge to the probate court's finding of laches also fails.

The equitable defense of laches may bar relief to those who neglect their rights, where the neglect operates to the detriment of others.  (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1417-1418 (*Bono*).)  "The doctrine of laches bars a cause of action when the plaintiff unreasonably delays in asserting or diligently pursuing the cause and the plaintiff has acquiesced in the act about which the plaintiff complains, or the delay has prejudiced the defendant."  (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 77 (*Johnson*), accord, *Pacific Hills Homeowners Assn. v. Prun* (2008) 160 Cal.App.4th 1557, 1564-1565.)  "Delay alone ordinarily does not constitute laches, as lapse of time is separately embodied in statutes of limitation.  [Citation.]  What makes the delay unreasonable in the case of laches is that it results in prejudice."  (*Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36.)  "A delay is excusable where it was caused or contributed to by the conduct of the party who claims laches." (*Smetherham v. Laundry Workers' Union, Local No. 75* (1941) 44 Cal.App.2d 131, 139.)

Laches "is not applied strictly between near relatives," "'is not designed to punish a plaintiff,'" and "is 'invoked only where a refusal would be to permit an unwarranted injustice.'"  (*Berniker v. Berniker* (1947) 30 Cal.2d 439, 448-449, accord, *Bono, supra*, 103 Cal.App.4th at p. 1418.)  In general, the existence of laches is a question of fact determined by the trial court in light of all of the applicable circumstances.  (*Bono, supra*, at pp. 1417-1418.)  "Generally, a trial court's laches ruling will be sustained on appeal if there is substantial evidence to support the ruling."  (*Johnson, supra*, 24 Cal.4th at p. 67.)

16.

Here, the probate court found laches barred Erlinda's challenge to the validity of the Agreement because (1) although she understood the Agreement and its effect, she never asserted she did not understand the Agreement, that she objected to it, or that she intended to challenge its validity; and (2) Saverio's actions in providing the annuity and bequest for Erlinda were based on his understanding and reliance, through Erlinda's silence, that she understood and agreed to the Agreement's terms.

Erlinda argues the laches defense does not apply because (1) substantial evidence does not support the trial court's finding that she unreasonably delayed in challenging the validity of the Agreement, as the evidence shows she did not know what her rights were until after Saverio's death, and (2) respondents are estopped from asserting the defense because any delay on her part was caused by Saverio's failure to explain what her rights would have been had she not signed the Agreement. She takes issue with the trial court's finding that she understood the Agreement and its legal effect, arguing essentially that the evidence does not establish that she knew she was giving up any claim to earnings from Saverio's labors during the marriage by signing the Agreement. She reasons that if she was never advised of her rights, it cannot be said that she slept on her claim. Pointing to her testimony that she did not know her rights until after Saverio's death, what she claims is a lack of evidence that she ever understood the Agreement or that she had a reason or right to object to the Agreement under California law, and her assertion that Saverio's failure to advise her of her rights before she signed the Agreement contributed to any purported delay in objecting to the Agreement, she asserts substantial evidence does not support the finding of laches.

Erlinda's challenge is aimed at the probate court's factual findings upon which it based its decision to apply the doctrine of laches. Erlinda, however, failed to set forth all the evidence in the record that supports those findings, which are amply supported by the evidence that she knew the legal effect of the Agreement and her rights before Saverio's

17.

death, yet she failed to object, and therefore her delay was not attributable to Saverio's failure to explain the Agreement to her before she signed it.

We therefore conclude that the probate court did not err when it applied the doctrines of laches and equitable estoppel to bar Erlinda's challenge to the validity of the Agreement. Therefore, it does not matter whether the Agreement was valid and we do not reach the other issues Erlinda raises on appeal relating to the Agreement's alleged invalidity based on Probate Code sections 143, 144 and 146, Saverio's breach of fiduciary duty, and her mistake of law.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

_____
GOMES, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.

18.