Filed 10/13/20  Whynaught v. Regal Medical Group CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANDREW WHYNAUGHT, | |
| Plaintiff and Respondent, | G058253 |
| v. | (Super. Ct. No. 30-2018-00987851) |
| REGAL MEDICAL GROUP, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Layne H. Melzer, Judge.  Affirmed.

Doll Amir & Eley, Michael M. Amir and Lloyd Vu for Defendant and Appellant.

Paoli & Purdy and Court B. Purdy for Plaintiff and Respondent.

\*          \*          \*

Regal Medical Group (Regal) appeals from the trial court's order denying its motion to compel Andrew Whynaught to arbitrate his wrongful termination claim. Regal contends the court erred in finding it failed to establish the parties agreed to arbitration. As we explain, substantial evidence supports the trial court's factual determination that Regal "has not met its burden to show the existence of an arbitration agreement" between the parties. The court was also correct as a matter of law when it found no implied agreement to arbitrate, relying on this court's decision in *Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164 (*Mitri*). We therefore affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Regal began implementing an alternative dispute resolution program for employment disputes in the spring of 2016. As part of the implementation process, Regal updated its employee handbook (Handbook or Employee Handbook) to describe the program as follows: "This program was created to provide you and the Company a mechanism for resolving disputes which is less costly and time consuming than resorting to the courts. The Company and all employees of the Company are subject to this alternative dispute resolution program."

The Handbook did not include the terms of the dispute resolution program, which was embodied in a separate agreement. As the Handbook explained, "As part of this program, you will be asked to read and execute the Company's Mutual Arbitration Agreement [MAA] which sets forth more detail regarding this program." According to Whynaught, he never received or executed the MAA.

Whynaught had been employed at Regal as a vocational nurse and behavioral case manager since July 2015 so his employment predated the initiation of the MAA. On August 4, 2016, as reflected in his personnel file, Whynaught executed and returned a document entitled "Handbook Acknowledgment" to Regal's human resources department. The one-page form consisted of several paragraphs regarding receipt of the

2

Handbook, including one stating, "I acknowledge, by my signature below, that the Company has implemented an alternative dispute resolution program, and I agree to execute and be bound by the Company's Mutual Arbitration Agreement."

On November 27, 2016, Whynaught suffered serious injuries when he was rear-ended by a hit and run driver. Whynaught's injuries included a "herniated disc with nerve impingement," which required spinal fusion surgery. His doctor placed him under "no work" restrictions during a lengthy rehabilitation process. Whynaught kept Regal apprised of his condition and the course of his medical treatment, including by written communications from his physicians.

Whynaught claimed Regal wrongly terminated him in July 2017, for "unauthorized leave of absence since June 1, 2017," and falsely accused him of forging a doctor's note regarding his continuing inability to work. Whynaught asserted Regal ignored his "doctor's note for May 2017" and his doctor's "progress report" for June that stated his convalescence "'will be up to 3 months,'" and verified that the "'Patient is unable to work during this time.'" Regal also refused to engage in efforts "to clarify the obvious mistake in their accusation of fraud," according to Whynaught.

Whynaught sued Regal in the superior court in April 2018, alleging disability discrimination and failure to provide reasonable accommodation under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), as well as wrongful termination in violation of public policy. Regal answered the complaint in June 2018, and filed its motion to compel Whynaught to arbitrate his claims under the MAA in July 2019.

In support of its motion, Regal submitted the declaration of Teresa Lugo, an "Employee Services Manager" whose responsibilities included "Human Resources ('HR') issues for Regal." Attached to Lugo's declaration was the Handbook Acknowledgment form that Whynaught signed in August 2016 and several excerpts from

3

the Handbook regarding the MAA, including the Handbook's statement advising employees they were required to "execute" the MAA.

Lugo's declaration referenced two e-mails she did not author or adequately authenticate. One email that was not dated appears to be a message from a "Jay Schwanz" to "Sandra Finley" and "Kimberly Powell," copying also "Juliette Sullivan" and "Stephanie Cohen." Lugo did not identify Schwanz in her declaration, nor any of the recipients except Cohen, whom she described as "Regal's Senior Human Resource Manager." The message was "FYI – the EE Handbook was sent out Wednesday evening," and closed with Schwanz's first name, "Jay."

Schwanz's e-mail appears to forward to his four recipients a May 4, 2016, e-mail authored by Cohen, who, in turn, had addressed her message to two recipients, herself and Sullivan. Although addressed in the e-mail header to herself and Sullivan, the body of Cohen's e-mail stated, "Attention All Employees, [¶] We are pleased to send you the new 2016 . . . Employee Handbook and recently implemented, Mutual Arbitration Agreement. To help you better understand this new program, [we have] simplified the information in a one-page summary preceding the Mutual Arbitration Agreement."

The e-mail continued: "Attached you will find the following documents that require your signature. These documents need to be returned to Employee Services." Cohen identified the two documents as "Employee Handbook Receipt" and "Mutual Arbitration Agreement, page 6." Lugo's declaration also referenced copies of several documents she asserted were attached to Cohen's e-mail, including the six-page MAA. Page 6 of the MAA included, among other language, an express release or integration clause stating, "**By Signing Below, Employee Acknowledges that**: [¶] . . . [¶] Employee is not relying on any promises or representations by the Company except those contained in this Agreement." (Original boldface.) Page 6 of the MAA also provided a designated space for the "Employee" and a Regal representative to give express assent to the MAA by signing and dating it.

4

Cohen's May 4 e-mail also included, in addition to the Handbook Receipt and the MAA, a third document "attached for your reference," which she described as "the detailed JAMS (Judicial Arbitration and Mediation Services) Employment Arbitration Rules & Procedures." Cohen's e-mail did not indicate it attached the actual Employee Handbook, but provided instructions for finding the Handbook on the company's internal "intranet home page." Cohen's e-mail closed with a final directive in boldface type to return "**the required two forms to your Supervisor/Manager**."

Lugo's declaration referenced a second e-mail that appears to forward another e-mail from Cohen. As with the first e-mail from "Schwanz," Lugo did not indicate how anyone transmitted Cohen's forwarded e-mails or their contents to Whynaught—who was not named as a recipient in the e-mail header, nor in the body of any of the e-mails. Additionally, unlike Jay Schwanz's e-mail forwarding Cohen's May 4 e-mail, this second e-mail submitted by Lugo was undated and had the "From," "To," and "Subject" fields in the header blacked out. The entire body of the message was similarly redacted, leaving only Cohen's e-mail. Cohen's second e-mail, dated May 16, 2016, was thus forwarded, if at all, by an unknown person to unknown recipients.

Cohen's second e-mail identified her as the sender, but did not identify the recipient or recipients—there is no recipient field in the header. The "Subject" field of the e-mail states: "Attention Required by ALL employees New 2016 Employee Handbook & Arbitration Agreement DUE FRIDAY MAY 20th," with the subject field trailing off from there in ellipses (". . . ."). The body of the e-mail begins in large font: "Gentle Reminder – forms due back by Friday 05/20." The remainder of the e-mail reverts to a smaller font and states, "Attention All Employees (excluding agency temps)" before repeating much of Cohen's May 4 e-mail. It states again that "the following documents . . . require your signature," again identifying the Handbook Acknowledgment and page 6 of the MAA. And it closes with the same boldface directive to "**return the[se] required two forms to your Supervisor/Manager**."

5

The header attached to Cohen's May 4 and May 16 e-mails indicated three PDF files were attached to each: (1) the Handbook Acknowledgment; (2) the JAMS rules; and (3) the "2016 Arbitration Agreement & Memo," which Lugo identified in her declaration as the MAA.

In opposing Regal's motion to compel arbitration, Whynaught disputed receiving either of Cohen's e-mails attaching the MAA, which the parties agree he never signed. He stated in his declaration, "I don't recall receiving an email in May of 2016, from Stephanie Cohen introducing a new Arbitration Program with any attachments to review, sign and return to Human Resources." He testified that "[r]eceipt of [Regal's] Motion [to compel arbitration] was the first time I ever saw the MAA." Although Regal's counsel disputed this conclusion during oral argument, we believe this statement raised an inference that Whynaught never received the MAA via e-mail or by any other means.

Whynaught also testified that the absence of a signed copy of page 6 of the MAA in his personnel file was "consistent with my recollection that I was never trained on this agreement, was unaware that it had been implemented and never reviewed it during my employment." He observed "in my experience" that "the diligent nature of the human resources department [at] Regal . . . never allowed me to ignore signing off on training, annual reviews or any employment related records."

Whynaught testified he received training regarding the Handbook in June 2016. He did not recall why he signed the Handbook Acknowledgment in August 2016, well after the May 2016 Cohen e-mails on which Regal relied to establish he received notice of the MAA's terms, and two months after his June training session regarding the Handbook. He testified that since he began working at Regal in 2015, the Handbook was available "as a resource should a question arise regarding employment issues." He reiterated that he had never "reviewed or signed" the MAA.

6

After a hearing, the trial court denied Regal's motion to compel arbitration, finding Regal "has not met its burden to show the existence of an arbitration agreement."

The court ruled "[a]s an initial matter" that Regal did not "show that Plaintiff received . . . the two emails that attached the MAA," nor had it presented persuasive evidence "to show that Plaintiff read" or received the MAA. The court noted that Lugo "testifie[d] that the emails were sent to all employees," but found her declaration regarding the e-mails "does not meet the requirements of the business records exception. (Evid. Code, § 1271(a)-(d).)"

Alternatively, as a separate basis for its decision denying arbitration, the court found that Regal "has not shown that even taking all of its evidence as true that Plaintiff agreed to arbitrate."

Specifically, the trial court found Whynaught's "signature on the Acknowledgment form is insufficient," relying on this court's decision in *Mitri*, *supra*, 157 Cal.App.4th 1164. The trial court held that when, as here and in *Mitri*, the company handbook "contemplates the signing of a separate [arbitration] contract," an "employee's acknowledgment of the handbook [is] insufficient to show an agreement to arbitrate."

The trial court also analyzed the language in the MAA, which purportedly made continued employment tantamount to implied consent to arbitrate. The trial court held that, as in *Mitri*, language making arbitration a mandatory "condition of employment" did not vitiate a company's express statements that "all employees are required to sign an arbitration agreement." As noted above, the parties agree Whynaught never signed the MAA. (*Mitri*, *supra*, 157 Cal.App.4th at pp. 1170-1171.) As we explained in *Mitri*, the express signature requirement "completely undermines any argument by defendants the [mandatory arbitration] provision in the handbook itself was intended to constitute an arbitration agreement between [the company] and its employees." (*Ibid.*)

7

The trial court found legally ineffective the MAA's mandatory arbitration provision stating that no "affirmative signature" was required to ratify it, because "several other conflicting documents" stated endorsement was necessary, including Regal's Handbook and its Acknowledgment form that Whynaught signed. The court also found the MAA's "no signature is needed" provision did not apply for an additional, fact-based reason: the MAA itself stated that implicit employee ratification of arbitration depended not only on "continued employment with the Company," but also the "Employee's knowledge of [the MAA]," which the court found Regal had not established.

The trial court did not reach Whynaught's alternative claim that Regal waived arbitration, if it applied, by litigating the case for more than a year before filing its motion.

Regal appeals from the trial court's order denying arbitration.

## DISCUSSION

1. *General Principles, Contentions, and Standard of Review*

It is well established that arbitration is a matter of contract. (*Sparks v. Vista Del Mar Child & Family Services* (2012) 207 Cal.App.4th 1511, 1517-1518.) """Although "[t]he law favors contracts for arbitration of disputes between parties" [citation], "'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . .'" [Citations.]'" [Citation.] "Absent a clear agreement to submit disputes to arbitration, courts will not infer that the right to a jury trial has been waived."'" (*Id.* at p. 1518.)

"'[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine *whether the agreement exists* and, if any defense to its enforcement is raised, whether it is enforceable. *Because the existence of the agreement is a statutory*

8

*prerequisite to granting the petition*, the petitioner bears the burden of proving its existence by a preponderance of the evidence.'" (*Mitri*, *supra*, 157 Cal.App.4th at p. 1169, original italics; Code Civ. Proc., § 1281.2.)

Regal challenges the trial court's factual determination that it failed to meet its burden of proof to establish Whynaught received the MAA. Regal also argues that, even if Whynaught never received a copy of the MAA, a binding arbitration agreement existed based on his continued employment with notice of the agreement.

Our standard of review varies according to these respective factual and legal challenges. When a trial court's order denying arbitration "'is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.'" (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60 (*Avery*).) "Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning." (*Ibid.*)

2.    *Business Records Hearsay Exception*

Regal's initial challenge is governed by the substantial evidence standard "because the motion turned on conflicting evidence regarding whether [Whynaught] received and agreed to [Regal]'s arbitration policy." (*Avery*, *supra*, 218 Cal.App.4th at p. 60.) In support of its challenge, Regal contends in a footnote that the trial court erred in finding that Lugo's testimony did not establish Cohen's e-mails fell within the business records hearsay exception. We review a trial court's evidentiary rulings for abuse of discretion, including whether a proper foundation has been laid for the admission of business records. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1450.)

Business records are admissible under Evidence Code section 1271 when "(a) The writing was made in the regular course of a business; [¶] (b) The writing was

9

made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity *and the mode of its preparation*; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (*Ibid.*, italics added.)

Regal contends Cohen's e-mails were not hearsay—and therefore did not require a business records foundation—because they were "not offered to prove the truth of any statements by Ms. Cohen." We disagree. The relevant question was this: is it true these e-mails were sent to and received by "all employees?" The accuracy of Cohen's opening address, with its implication that the e-mails reached all Regal employees, was critical to Lugo's claim that Cohen's e-mail—with the attached MAA—was sent to and received by Whynaught even though he was not a named recipient.

As to foundation, Lugo described her position at Regal, namely, "Senior Employee Services Manager" with HR responsibilities, and then stated that she attached to her declaration Cohen's e-mails as "certain business records which are kept in the ordinary course of business." These conclusory statements were insufficient to satisfy the requirements of Evidence Code section 1271. Lugo failed to address the "mode of preparation" of Cohen's e-mails to indicate how Cohen created them; nor did she explain how they might have been transmitted to Whynaught when he was not identified in the header as a recipient. Regal failed to lay the foundation required for admission of these e-mails as a business record. The trial court therefore did not err in excluding them.

3.      *Substantial Evidence Supports the Trial Court's Ruling*

In any event, even if the e-mails had been admissible, substantial evidence presented to the trial court supports its ruling. Whynaught produced ample evidence from which the court could conclude he never received a copy of the MAA. He denied "ever seeing" the MAA before receiving Regal's motion to compel arbitration. This statement unequivocally made his alleged receipt of the MAA a question of fact.

10

The evidentiary void created by Regal's failure to explain how Cohen's e-mails could have reached Whynaught, when he was not an express e-mail recipient, left the trier of fact free to conclude that Whynaught did not receive the emails. The trial court's ruling implicitly reflects it found Whynaught's testimony credible. The testimony of a credible single witness supports a ruling. (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201.) This was fatal to Regal's implied contract claim as the basis for its arbitration motion.

A. *No Implied Contract, as a Factual Matter*

Regal argues the court was required to conclude Whynaught impliedly agreed to arbitrate his claims by continuing to work at the company. We disagree.

"[A]n agreement to arbitrate may be express or implied so long as it is written." (*Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 384 (*Harris*); Code Civ. Proc., § 1281.) An implied contract may arise in combination with express terms, as when a student by his or her conduct accepts written terms embodied in a university's website aimed at prospective students. (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 816-817.) Consent to an arbitration contract may be "implied-in-fact where . . . the employee's continued employment constitutes her acceptance of an agreement proposed by her employer." (*Harris*, at p. 384.)

When conflicting inferences may be drawn from the evidence, as here, whether an implied contract exists is a question of fact for the trial court to decide. (*Gorlach v. Sports Club* (2012) 209 Cal.App.4th 1497, 1508.)

Regal premised its implied contract claim on a paragraph on page 6 of the MAA. The paragraph stated in two sentences: "Employee understands that his/her affirmative signature and/or acknowledgment of this Agreement is not required for the Agreement to be enforced. If Employee begins or continues working for the Company without signing this Agreement, this Agreement will be effective, and Employee will be deemed to have consented to, ratified and accepted this Agreement *through Employee's*

11

*knowledge of it* and Employee's acceptance of and continued employment with the Company." (Italics added.)

This provision required the "Employee's knowledge of" the arbitration agreement for that agreement to be binding. Therefore, the trial court's finding that Regal had not met its burden to show Whynaught received the MAA supports the court's conclusion no arbitral contract was formed. The trial court's ruling was correct.

As *Mitri* explained, an employee's general knowledge by virtue of a handbook that an employer is proposing to implement a dispute resolution program as detailed in a separate agreement does not suffice to form a contract on the terms stated in the separate agreement. In such instances, the handbook "only place[s] [employees] on notice that they would be called upon to sign a separate binding arbitration agreement." (*Mitri*, *supra*, 157 Cal.App.4th at p. 1171.) The handbook is therefore only "'informational rather than contractual.'" (*Harris*, *supra*, 248 Cal.App.4th at p. 382.)

Of course, where the arbitration agreement *is* provided to the employee, his or her "ch[oic]e not to read or take the time to understand these provisions is legally irrelevant." (*Harris*, *supra*, 248 Cal.App.4th at p. 383.) "An arbitration clause within a contract may be binding on a party even if the party never actually read[s] the clause." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*).) Similarly, memoranda delivered to employees with unilateral arbitration terms (e.g., "IT APPLIES TO YOU") conditioned only on continued employment may be effective when that condition is met, i.e., the employee continues to work for the employer. (*Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126, 130 (*Diaz*); *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420 (*Craig*).)

But in the absence of proof of delivery, *Diaz* and *Craig* are inapposite. As the trial court found, Whynaught "was not told that his continued employment was sufficient to constitute an agreement." Substantial evidence supports that finding, where

the trial court could reasonably conclude Whynaught did not receive Cohen's e-mails and there was no proof Regal otherwise gave Whynaught a copy of the MAA.

Notably, Regal did not produce Cohen's original e-mails, which might have shown the recipients of her May 16 e-mail or that she had more than two recipients of her May 4 e-mail. Nor, as noted above, did Regal provide any testimony about how Cohen's e-mails could have reached Whynaught, though he was not identified as a recipient. Regal presented only Lugo's declaration with her bare assertion that Cohen's e-mails were "company-wide."

Under the substantial evidence standard on appeal, we must defer to the trial court's factual findings. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) This applies with particular force where the evidence is conflicting (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188). Whynaught presented evidence he did not receive the e-mails or the MAA by other means. "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (Evid. Code, § 412.) We cannot say the trial court erred in finding Regal did not meet its burden to show Whynaught's receipt of the MAA and agreement between the parties to arbitrate.

The general policy favoring arbitration "'"'cannot displace the necessity for a voluntary *agreement* to arbitrate."'"'" (*Sparks*, *supra*, 207 Cal.App.4th at p. 1518.) An implied contract no less than an express contract requires a "meeting of the minds." (*Mulder v. Mendo Wood Products, Inc.* (1964) 225 Cal.App.2d 619, 632; accord, *Friedman v. Friedman* (1993) 20 Cal.App.4th 876, 887.) A contract implied in fact by conduct requires as its essence the mutual agreement of the parties. (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636.)

It follows that there can be no meeting of the minds when the employer does not share the terms of its proposed arbitration agreement with the employee. The

13

cases on which Regal relies therefore do not apply. (E.g., *Diaz*, *supra*; 34 Cal.App.5th 126; *Craig*, *supra,* 84 Cal.App.4th 416; see also *Harris*, *supra,* 248 Cal.App.4th 373; *McLaurin v. Russell Sigler, Inc.* (C.D. Cal. 2016) 155 F.Supp.3d 1042; *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.* (2d Cir. 1986) 815 F.2d 840.)

*Pinnacle*, cited by Regal, is also inapposite. It involved arbitration terms formed under CC&Rs publicly recorded by a community developer, and therefore applicable by constructive notice to the community homeowners' association, though the association had not (and could not have) yet elected any members at the time the CC&Rs were recorded. As the trial court explained, *Pinnacle* is "wholly distinguishable" from the employment context here. Moreover, there is no footing for constructive notice to apply here where the MAA itself requires "the Employee's knowledge of" the arbitration agreement for it to apply. This condition presupposes that the employee was given the agreement. The trial court found that did not occur here. Because substantial evidence supports this conclusion, the court did not err in declining to compel arbitration for lack of agreement.

B.    *No Implied Contract on Purely Legal Grounds Either*

Apart from the trial court's factually supported basis for denying arbitration, the court was also correct on strictly legal grounds. As the court stated in its ruling, "Putting this aside [lack of proof Whynaught received Cohen's e-mails], Defendant has not shown that even taking all of its evidence as true that Plaintiff agreed to arbitrate."

When there are "no facts in dispute, the existence of a contract is a question we decide de novo." (*Harris*, *supra*, 248 Cal.App.4th at p. 381.) In directing our attention to page 6 of the MAA, and relying solely on the continued-employment-equals-ratification-of-arbitration paragraph, Regal overlooks a key paragraph above that one, on the same page. The paragraph states: "**By Signing Below, Employee Acknowledges**

14

**that**: [¶] . . . [¶] Employee is not relying on any promises or representations by the Company except those contained in this Agreement."

This language functions as an integration clause, precluding reference to terms or representations by the parties outside the four corners of the MAA to add to or vary its meaning. (Code Civ. Proc., § 1856; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953.) But the integration clause is itself conditional, stating that it becomes effective with the employee "**Signing below**." The parties agree Whynaught never signed the MAA.

Consequently, even assuming arguendo that Whynaught received Cohen's e-mails and, with them, the attached MAA, the "continued employment" paragraph on page 6 of the MAA, which purported to bind Whynaught to arbitration regardless of whether he signed the MAA, did not vitiate Regal's earlier representations in the Handbook, the Handbook Acknowledgment, and in Cohen's e-mails that signing the MAA was "required." As *Mitri* teaches, when an employer "reinforc[es] an intent to have employees sign a separate arbitration agreement to effectuate [its] policy of arbitrating employment claims," mere continuation of employment does not constitute assent to arbitration. (*Mitri*, *supra*, 157 Cal.App.4th at p. 1171.)

At the very least, as the trial court observed here, Regal muddied the waters as to whether Whynaught's signature was required before its new dispute resolution program took effect. On page 6 of the MAA, Regal said no signature was required, only continued employment (assuming notice). "In fact," however, as the trial court noted in its ruling, Regal "told [Whynaught] the opposite in several other conflicting documents." And the conditional integration clause on page 6 furnished no clarity in the absence of Whynaught's signature, suggesting Regal's prior representations were still effective— while at the same time contradicting the no-signature paragraph on the same page.

The Civil Code provides that "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." In this

15

case, that is the drafting party, Regal.  (Civ. Code, § 1654; *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1370.)  In the absence of Whynaught signing off on arbitration as Regal repeatedly said was necessary, we cannot say there was the """clear agreement""" by the parties necessary """to submit disputes to arbitration."""  (*Sparks*, *supra*, 207 Cal.App.4th at p. 1518.)  The trial court did not err in denying Regal's motion.

### DISPOSITON

The trial court's order denying Regal's motion to compel arbitration is affirmed.  Whynaught is entitled to his costs on appeal.


GOETHALS, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.


16